UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_Judge Hellerstein_

795

| | |
|---|---|
| ALEXANDER LELCHOOK, ESTER LELCHOOK, THE ESTATE OF DAVID MARTIN LELCHOOK, MICHAL LELCHOOK, YAEL LELCHOOK, AND DORIS LELCHOOK<br><br>Plaintiffs,<br><br>v.<br><br>COMMERZBANK AG<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**COMPLAINT**
**JURY TRIAL DEMANDED**

RECEIVED
JUL 30 2010
U.S.D.C. S.D. N.Y.
CASHIERS

1.     Plaintiffs Alexander Lelchook, Ester Lelchook, Estate of David Martin Lelchook, Michal Lelchook, Yael Lelchook, and Doris Lelchook (hereafter collectively "Plaintiffs"), allege the following upon information and belief, except for allegations specifically concerning the Plaintiffs, which allegations are made upon Plaintiffs' personal knowledge.    Plaintiffs' information and belief is based upon, *inter alia*, Plaintiffs' counsel's investigation, which included, without limitation, review and analysis of publicly available United States ("U.S."), Israeli, German and United Nations reports, news articles, media reports, academic journals, public policy center publications and investigative materials.

## NATURE OF THE ACTION

2.     This is a complaint for damages arising out of the conduct of defendant Commerzbank AG. Defendant is a financial institution incorporated and headquartered in Germany that knowingly provided financial services and collects and transmits money for the benefit of Hizbullah a.k.a. Hizballah, Hezbollah (hereinafter referred to as "Hizbullah"), a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")), and thereby substantially

1

assisted in the commission of acts of international terrorism, as defined by 18 U.S.C. § 2331. By its actions, the Defendant aided and abetted the commission of acts of international terrorism that murdered David Martin Lelchook, the decedent and injured each and all of the Plaintiffs, violated the criminal prohibitions on providing material support for acts of international terrorism as set forth in the Antiterrorism Act ("ATA") as amended by the AEDPA (see e.g., 18 U.S.C. §§ 2339B and 2339C), and is civilly liable under §2333(a) of the ATA to each of the Plaintiffs who have been injured in their person and property and have suffered damages by reason of acts of international terrorism perpetrated by Hizbullah.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 2333 and 2334, as a civil action may be brought by citizens of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism. The Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs.

4.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

5.      Commerzbank AG is subject to personal jurisdiction in the United States pursuant to Fed.R.Civ.P. 4(k) because, among other things, it continuously and systematically does business in the United States. Defendant is also subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2339B(d)(1)(D) because it has committed tortious acts within the United States, and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

## THE PARTIES

### A.    PLAINTIFFS

6.    Plaintiff Alexander Lelchook, Ester Lelchook, Michal Lelchook, Yael Lelchook, and Doris Lelchook are the surviving brother, spouse, daughter and mother of American citizen David Martin Lelchook, who was murdered in a Hizbullah rocket attack. Plaintiffs Michal Lelchook, Yael Lelchook Alexander Lelchook and Doris Lelchook are American citizens. Plaintiff Esther Lelchook, the decedent's surviving wife, who is a citizen of Israel brings this action in her individual capacity but also as the heir of David Martin Lelchook and is authorized under Israel law to bring this action on behalf of the Estate of David Martin Lelchook. All of the Plaintiffs injuries were the foreseeable result of terrorist missile attacks deliberately launched by Hizbullah against civilian targets in Israel from July 12, 2006 through August 14, 2006.

### B.    DEFENDANT

7.    Defendant Commerzbank AG ("Commerzbank" or "Defendant") was established in Hamburg, Germany in 1870 and provides a broad range of retail, commercial, corporate, investment and international banking services to local and international clients.

8.    Commerzbank AG maintains its principal place of business in Frankfurt, Germany.

9.    Commerzbank AG conducts business in the United States and maintains a branch office at Two World Financial Center, New York, NY 10281-1050. Commerzbank AG is registered with State of New York Banking Department as a foreign branch and the above address is listed as its registered address.

3

10.    Defendant intentionally, knowingly, recklessly, or with willful blindness provided services to one of Hizbullah's fundraising organizations, Weisenkinderprojekt Libanon e.V (The Orphans Project Lebanon); a German organization which according to the German federal government is affiliated with the Lebanese Al-Mua'assat al-Shahid, also known as Boniad-e Shahid, Bonyad Shahid, The Martyrs Foundation Charitable Social Society, Al-Shahid Social Association, and Ashaheed Foundation (hereafter "the Martyrs Foundation"), an entity which specifically promotes suicide missions, militant activities and takes care of the families of so-called martyrs.    On July 24, 2007 the US government designated the Al-Shahid Association to the US terrorism list.

11.    Commerzbank AG can sue and be sued in the United States.

## FACTUAL ALLEGATIONS

## I.    HIZBULLAH: A TERORIST ORGANIZATION FROM ITS INCEPTION

### A.    CREATION AND MISSION

12.    Hizbullah first emerged during the Lebanese civil war in the early 1980s as a militia comprised of Shia followers of the Ayatollah Ruhollah Musawi Khomeini of the Islamic Republic of Iran.    Its members were trained, organized and funded by the Iranian Revolutionary Guard.

13.    Hizbullah's aims and goals were published in February 1985 in a letter entitled "The Hizbullah Program."

14.    With respect to Israel, the Hizbullah Program states:

We see in Israel the vanguard of the United States in our Islamic world.  It is the hated enemy that must be fought until the hated ones get what they deserve.... <u>our struggle will end only when this entity is obliterated. We recognize no treaty with it, no cease fire, and no peace agreements, whether separate or consolidated.</u> (Emphasis added.)

15.    Since its founding, Hizbullah has at all times sought, as an official and publicly stated policy and goal, to harm, weaken and undermine the United States militarily, economically and politically.  To achieve its goal, Hizbullah has carried out hundreds of terrorist attack against Americans and American targets, which have killed hundreds of U.S. citizens and wounded hundreds more.

16.    Because Israel is an ally of the United States, and harming Israel, weakens, harms and undermines the United States, Hizbullah has at all times since its founding sought to achieve its goal of harming, weakening and undermining the United States by carrying our terrorist attacks against Israelis and Israel targets, including Israeli citizens.

17.    Since its founding, Hizbullah has at all times used terrorism against Americans and American targets, and against Israel and Israeli targets, including American and also Israeli citizens, in order to coerce, intimidate and influence the United States government and public and thereby harm, weaken and undermine the governments of the United States and Israel in an overt attempt to influence the policy of said governments by their use of terrorist means activities and illegal actions.

**B.    HIZBULLAH'S NETWORK**

18.    After its founding, Hizbullah evolved into a multifaceted, sophisticated, highly organized, politically powerful, and well-financed terrorist organization.

19.    Hizbullah conducts itself as a multinational corporate or quasi-governmental terrorist entity, with departments, agencies, branches, in-house banking, insurance, and other financial services, and media outreach.  Its estimated enterprise value is worth billions of U.S. dollars.

20.    Hizbullah's network consists of a multitude of departments and operations that assist its leadership in carrying out its mission, and include, but are not limited to, entities that are tasked with: (1) terrorist and paramilitary activities;; (2) general fundraising; (3) construction and infrastructure; (4) financial and insurance services; and (5) media services; and also (6) social services and "charitable" activities.  Although Hizbullah's entire network of operatives is relevant, certain Hizbullah-controlled entities are particularly germane to this action, especially the Martyrs Foundation and also The Orphans Project Lebanon noted *infra*, .

Weisenkinderprojekt Libanon e.V ("The Orphans Project Lebanon")

21.    The Orphans Project Lebanon association collects donations in Germany and, according to the German federal government, is affiliated with the Martyrs Foundation (Lebanese Al-Mua'assat al-Shahid, also known as Boniad-e Shahid, Bonyad Shahid, The Martyrs Foundation Charitable Social Society, Al-Shahid Social Association, and Ashaheed Foundation) and operating as a Hezbollah front and fundraising feeder organization.

22.    According to the description found in its website in December 2008, the Orphans Project Lebanon's mission is to support the projects of the Al-Shahid Association and to publicize them in Germany.

23.    The description also states:

*"We want to reduce suffering and offer a future. For this reason, we work closely with the Al-Shahid Association in Beirut. This organization is a serious, committed institution which assists children and families of war victims with sponsorship programmes as we as training projects and medical care."*

24.    The Orphans Project Lebanon for example, operates a sponsorship project:

*"This project puts sponsors of various nationalities in Germany into contact with the orphaned children of the Al-Shahid Association."*

25.    The "projects" listing states:

6

*"You can obtain a donation receipt that can be submitted to the revenue office."*

26.    The connection between the Orphans Project Lebanon and the Al-Shahid Association can also be seen from the logos used by each (as inserted below). Until recently, both organizations at one time used an identical emblem showing a bird at a fountain. *See*:

Orphans Project Lebanon         Al-Shahid Association

       

27.    Further evidence of the connection between Orphans Project Lebanon and "Jamiyaat El Massaii El Khairrya", comes from the corporate records of the Orphans Project Lebanon which according to the Stuttgart (Germany) register of associations where the Orphans Project Lebanon is registered under the number VR 6074, states that should the Orphans Project Lebanon be dissolved, its assets will be transferred to the "Jamiyaat El Massaii El Khairrya" society roughly translated as the Society for the Common Interest and Charity.

28.    There exist direct ties between the Orphans Project Lebanon to the "Jamiyaat El Massaii El Khairrya" society. This Lebanese-registered organization is the same thing as "Jamiat Maasasat Alshahid al Khayriya al Igtimaiya", also known as the Al-Shahid Association or Ashahid Association.

29.    The German State of Baden-Wurttemberg Office for the Protection of the Constitution considers the Orphans Project Lebanon part of Hizbullah:

"[Hezbollah} is also financed by means of charitable donations collected abroad by certain organizations. These include, for instance, the 'Orphans Project Lebanon', which is also active in Baden-Wuttemberg.

30.    In that regard, the District Court of German State of Gottingen declared on

December 5, 2008:

> *"There is no doubt that the donations collected by the 'Orphans Project Lebanon'*
> *association are made available to the 'Ashahid (martyr) Associations' in Lebanon and*
> *the conclusion that this association is affiliated with Hezbollah...*

31.    The German State of Bremen Office for the Protection of the Constitution reports:

> *"The 'Orphans Project Lebanon' exists in Germany since 1993 and cooperates closely*
> *with the Hezbollah organizations Ashahid Association. It is a welfare organization within*
> *the Heizbollah Network which tasks are the support of family members of Martyrs...and*
> *the arrangements for sponsors of so called martyr's children."*

32.    Moreover, in a 2003 report, the German State of Baden-Württemberg (published in May 2004), stated that the "Waisenkinderprojekt Libanon e.V." (Orphans Project Lebanon) is collecting money for Hizbullah.

33.    Further, in 2005 and 2006, Waisenkinderprojekt Lebanon" (Orphans Project Lebanon) had been publicly listed and named at least twice in the year 2005 and 2006 by German intelligence agencies as being connected to Hizbullah. For example, the published annual "Protection of the Constitution" reports of the Government of the German State of Bremen 2004 and 2005 (published in May 2005 and June 2006) state in the chapter dealing with Hizbullah, that the Orphans Project was cooperating closely with the Asahid Foundation which is a part of Hizbullah.

34.    Moreover, until recently, the Orphans Project Lebanon's own website for the Orphaned Children Project Lebanon explicitly stated that all funds raised for the orphans' adoption project are transferred <u>directly to the bank account of the Martyrs Foundation</u>. (emphasis added).

8

The Martyrs Foundation:

35.    Al-Mua'assat al-Shahid, also known as Boniad-e Shahid, Bonyad Shahid, The Martyrs Foundation Charitable Social Society, Al-Shahid Social Association, and Ashaheed Foundation (hereafter "the Martyrs Foundation"), is an organization associated with and controlled by Hizbullah.

36.    The Martyrs Foundation was established in Lebanon in 1982 and provides death benefits to the families of deceased terrorists through a sponsorship program. Sponsors may choose to support one or more people depending upon the size of the donation, and the Martyrs Foundation allegedly opens up a bank account in the recipient's name(s).

37.    The Martyrs Foundation was established to guarantee stipends for the families of Hizbullah fighters who die in battle. It also purports to open bank accounts for the "martyrs" children.

38.    Martyrs Foundation officials have close ties to Hizbullah's leadership and other charitable-appearing front/organizations within the Hizbullah network. For example, Qasem Aliq, a United States designated terrorist and Hizbullah official, is the former director of the Martyrs Foundation and current director of Jihad al-Bina (part of the Construction Department as discussed below).

39.    The Martyrs Foundation was established to increase terrorist's willingness to risk death. Its website states that one of the Martyrs Foundation's purposes is to spread the culture of jihad and martyrdom and preserve the image of sanctity of the "martyrs." The website also explicitly states that the Martyrs Foundation supports the Islamic Resistance in Lebanon.

40.    According to its own statements, the Martyrs Foundation takes care of the families of so-called terrorist martyrs who are sent on suicide missions and who are encouraged

to engage in militant activity. Jawad Nour-Al-Din, Director-General of the Martyrs Foundation, declared in a speech on the occasion of the 25th anniversary of the founding of Hizbullah, that he was proud to serve and help the families of resistance fighters.

41.    In addition, the Martyrs Foundation website contains an address by Hizbullah's Secretary General, Hassan Nasrallah, in which Hizbullah's cult of martyrdom is specifically encouraged.

42.    The Martyrs Foundation's website contains numerous instances where so-called "martyrs" are glorified. Loyalty to Hassan Nasrallah and the Islamic Republic of Iran, is also a recurrent theme on the Arabic-language website.

43.    The website contains photos of Nasrallah, his deputy Sheikh Naim Qassem, Hizbullah's former top terrorist and head of security, Imad Mughniyya, as well as the Imam Ayatollah Khomeini of the Islamic Republic of Iran.

44.    The Martyrs Foundation clearly sees itself as part of Hizbullah's fight against the United States, Israel and their allies. The Martyrs Foundation promotes the ideology of martyrdom, which the governments of the western world considers to be terrorist suicide bombings but which the Martyrs Foundation  considers to be the selfless sacrificing of one's life for Hizbullah's aims.

45.    Hizbullah has instilled the cult of martyrdom so deep in Lebanon's Shiite community that the death of a family member, "a martyr", is associated with social privilege and advancement. For example, healthcare for martyrs' relatives is free.

46.    Prior to Lebanese parliamentary elections, the Martyrs Foundation mobilized all its resources to support Hizbullah. In the past, families that had been previously supported by the Martyrs Foundation and that did not vote for Hizbullah experienced the cut off of their financial

and moral support benefits. They lost their privileged status as a martyr family and were branded traitors and schemers.

47.    In one survey carried out by the Martyrs Foundation in the schools and day-care centers it operates, more than 50% of the children declared that their sole aim was later to become a "shahid" or "martyr".

48.    The United States Treasury Department has detailed the dangerous objectives of the Martyrs Foundation:

> *The Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah ... To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. The Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hizballah ... In addition to fundraising responsibilities, senior Martyrs Foundation officials were directly involved in Hizballah operations against Israel during the July-August 2006 conflict.*

49.    On July 24, 2007 the US government added the Al-Shahid Association (Martyrs Foundation) to the US terrorism list along with organizations involved in terrorist activities, whose American assets and property were seized or frozen.

## II.    THE UNITED STATES DESIGNATES HIZBULLAH AND ITS NETWORK TERRORISTS

50.    The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") Public Law 104-132, empowers the United States Secretary of State to designate an entity a Foreign Terrorist Organization (an "FTO") when the Secretary determines that (1) the entity is foreign;

(2) it engages in terrorist activity; and (3) the terrorist activity threatens the security of the United States or its nationals.

51.    An FTO designation carries serious consequences. For example, the Secretary of the Treasury may require financial institutions to freeze the entity's assets, the organization's members and representatives can be barred from entering the United States, and anyone who knowingly provides "material support or resources" (including any donation of money) to the individual or entity may be prosecuted and imprisoned. The purpose of these provisions is to deny terrorist organizations access to or support from the United States.

52.    On October 8, 1997, by publication in the Federal Register (62 F.R. 52650), Hizbullah was designated an FTO. The designation was recertified every two years through 2004, when recertification as an FTO was no longer required pursuant to the Intelligence Reform and Terrorism Prevention Act of 2004.

53.    In addition to these FTO designations, Presidents Clinton and Bush issued executive orders pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, which authorized additional terrorist designations.

54.    On January 23, 1995, President Clinton signed Executive Order 12947, naming ten Palestinian organizations Specially Designated Terrorists ("SDT"), stating "the grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." SDT designations are specifically oriented toward persons (individuals and entities) who threaten to disrupt the Middle East peace process.

55.    The following Hizbullah-related individuals and entities have been designated SDTs pursuant to Executive Order 12947 on the following dates:

a.  Hizbullah
Designated: January 23, 1995.

b.  Hassan Nasrallah (Hizbullah leader)
Designated: January 24, 1995.

c.  Subhi Tufayli (former Hizbullah leader)
Designated: January 24, 1995.

d.  Imad Mughniyah (senior Hizbullah terror commander)
Designated: January 24, 1995.

e.  Sheikh Muhammad Husayn Fadlallah (Hizbullah ideological figure)
Designated: January 24, 1995.

56.    On September 23, 2001, President Bush invoked IEEPA to name Specially Designated Global Terrorists ("SDGT"), under Executive Order 13224, which blocks the property and prohibits transactions with persons who commit, threaten to commit, or support terrorism. Pursuant to Executive Order 13224, the definition of persons includes individuals and entities. The Secretary of the Treasury designated Hizbullah an SDGT on October 31, 2001.

57.    The following Hizbullah-related individuals and entities have been designated SDGTs pursuant to Executive Order 13224 on the following dates:

a.  Hizbullah
Designated: October 31, 2001.

b.  Al-Manar (Hizbullah Television)
Designated: March 23, 2006.

c.  Al-Nour Radio (Hizbullah Radio)
Designated: March 23, 2006.

d.  Lebanese Media Group (Parent Company of Al-Manar and Al Nour)
Designated: March 23, 2006.

e.  IRSO (Terror Fundraising Department)
Designated: August 29, 2006.

f.  Husayn al-Shami (IRSO, Terror Fundraising Department)

Designated: September 7, 2006.

g.    Bayt al-Mal (Hizbullah Treasury)
      Designated: September 7, 2006.

h.    Yousser Company for Finance and Investment (Hizbullah Banking)
      Designated: September 7, 2006.

i.    Jihad al-Bina (Construction Department)
      Designated: February 20, 2007.

j.    Qasem Aliq (Jihad Al-Bina, Construction Department)
      Designated: July 24, 2007.

k.    Ahmad al-Shami (The Martyrs Association)
      Designated: July 24, 2007.

l.    The Martyrs Foundation (Social Services Department)
      Designated: July 24, 2007.

m.    Al-Qard al-Hassan (Hizbullah Micro-Credit Organization)
      Designated: July 24, 2007.

n.    Goodwill Charitable Organization (U.S. fundraising branch of the Martyrs
      Foundation) Designated: July 24, 2007.

58.    In addition to the United States, several other countries have designated Hizbullah

a terrorist organization.  For example, Canada, the Netherlands, and Israel have designated

Hizbullah a terrorist organization, the United Kingdom and Australia have designated

Hizbullah's "External Security Force" a terrorist organization, and the European Parliament

passed a non-binding resolution recognizing "clear evidence" of "terrorist activities by

Hizbullah."

59.    The United States  designations were based upon each entity's open and notorious

support, assistance, aid, and services as part of Hizbullah's terrorist network, with each entity

fully intending to facilitate Hizbullah's violations of customary international law, as well as

United States federal and state law.

THE DEFENDANT'S CONDUCT

60.     Throughout the relevant time period, Defendant Commerzbank maintained accounts, collected and distributed funds and provided other financial services to the Orphans Project Lebanon.  Specifically, Commerzbank maintained the following account:

Waisenkinderprojekt Libanon e.V. (Orphans Project Lebanon e.V.)
Account No. 7001688
BLZ: 61140071 (Commerzbank)
Purpose: Lebanon Help 06

61.     As indicated above, the Orphans Project Lebanon and the Martyrs Foundation are a pivotal part of Hizbullah's fundraising infrastructure and a significant source of Hizbullah's financing, and at all relevant times Commerzbank knew or should have known its customer; and should have known of the direct  funding relationship between Orphans Project Lebanon and the Martyrs Foundation and/or Hizbullah.

62.     Commerzbank knowingly continues to maintain accounts for the Orphans Project Lebanon and provide financial services to Hizbullah even though the Orphans Project Lebanon has been publicly listed and named due to its relations with Hizbullah by German intelligence agencies in the years 2004, 2005 and 2006.

63.     Commerzbank knew or should have known about the Orphans Project Lebanon connection to Hizbullah because, *inter alia*: ,

a.     Every one of Germany's 16 domestic state intelligence agencies (State Offices for the Protection of the Constitution) plus the agency on the federal level publish annual reports.

b.     The findings are based on open source as well as on classical intelligence work.

c.     The reports are presented to the public by a press conference, where the highest ranking homeland security official addresses the key findings. In addition, both the state parliaments and the federal parliament debate the findings of the report.

d.    It is common that the media briefly informs the public about these report and its main findings.

e.    Research shows that the reports are available online and that they are being sent out in print if requested.

64.    Based upon applicable "Know Your Customer" ("KYC") and Anti Money Laundering ("AML") as well as Commerzbank's official compliance policy, Commerzbank knew or should have known that its customer, Orphans Project Lebanon, is a pivotal part of Hizbullah's fundraising infrastructure and a significant source of Hizbullah's financing.

65.    Commerzbank's official compliance policy (Annual Report 2005) provides in pertinent part::

*"Priority for compliance*

*Given the global character of Financial Institutions' duties, it bears special responsibility for aspects relevant to compliance. In order to identify and prevent money laundering and the financing of terrorism, for example, a money laundering prevention office has been set up that is linked up with the Bank's distribution units. Drawing upon our knowledge of the cultural, economic and legal conditions, we practise not only an extended customer due diligence but also a special assessment and identification of the risks."*

*Compliance risk*

*Very strict legal provisions apply in the financial sector as regards compliance. Commerzbank has established additional rules which are intended to ensure that the conduct of its employees is always correct even in difficult situations and is in line with current legislation. The Bank's compliance manual should be mentioned here, as well as staff guidelines of the Federal Banking Supervisory Office and the Federal Supervisory Office for Securities Trading (now German Financial Supervisory Authority – BaFin), which have been integrated through employment contracts or internal Bank agreements, and job instructions published on the Bank's intranet, providing staff with concrete guidelines for implementing the respective legislation. At Commerzbank, the staff department Compliance and Security sets up and monitors observance of such rules.*

*Compliance not only advises and informs the various business lines and the Bank's employees on general issues relevant to compliance, supporting colleagues in critical*

*cases of day-to-day business as well; in conjunction with the respective specialist departments, it also ensures that statutory or supervisory requirements relating to compliance are implemented*

*Since the attack on the World Trade Center in New York, the legal and supervisory requirements in connection with money laundering and the financing of terrorism have steadily increased, as has the public's interest in this topic.*

*In order to counter the specific risk that its business activities will be misused by third parties for the purpose of money-laundering or funding terrorism, the Bank is conducting an analysis of the threat posed by the existing relevant risks. The findings of this analysis will be taken into account as part of the constant adjustment and improvement of the Bank's preventive measures.*

*They will be integrated through the implementation of specific risk-mitigating measures, either when new customers are accepted, or when their transactions are monitored, but also in training staff and making them sensitive to the dangers. All the experience gained through this selective analysis and its continual monitoring will be used in adjusting the system of risk management. The Bank's employees are obliged to report out-of-the ordinary transactions raising the suspicion of money laundering or the funding of terrorist activities to Compliance/Financial Investigations, so that the transaction can be subjected to individual scrutiny."*

66.    By knowingly providing valuable financial services to Hizbullah, Commerzbank has provided material support within the definition set forth in 18 U.S.C. § 2339A(b) to a designated FTO, and has provided substantial assistance to Hizbullah in the commission of acts of international terrorism against Americans and in Israel, including the terrorist attacks that murdered David Lelchook and caused injury and damage to the Plaintiffs.

67.    The provision of financial services to Hizbullah violates both the criminal provisions of 18 U.S.C. §§ 2339B and 2339C and gives rise to civil liability under 18 U.S.C. § 2333(a) as set forth below.

III.    **HIZBULLAH'S 2006 MISSILE ATTACKS ON CIVILIAN TARGETS IN ISRAEL**

68.    On July 12, 2006, Hizbullah operatives crossed over from southern Lebanon into Israel and ambushed an Israeli military ("IDF") patrol. As a result of the ambush, three Israeli soldiers were killed, two Israeli soldiers were wounded and two other Israeli soldiers were kidnapped. This attack led to the thirty-four day battle between Israel and Hizbullah terrorists. According to the Israeli Police, during these thirty-four days (July 12th-August 14th), Hizbullah fired approximately 3,900 missiles at Israeli civilian population centers.

69.    As a result of the missiles Hizbullah fired at civilian targets from July 12 through August 14, 2006, many civilians, including Americans, such as the Plaintiff, and Israelis were killed and several hundred were injured. Hizbullah made abundantly clear through statements aired on Al-Manar and communiqués sent to news organizations that it was intentionally and deliberately firing missiles at civilian towns and cities in Israel. These terrorist attacks were in a deliberate attempt to injure and kill innocent persons, including the Plaintiffs.

70.    Defendant knew, or consciously or recklessly disregarded knowing, that Hizbullah committed terrorist operations by targeting civilians with indiscriminate missile attacks without warning, and that Hizbullah did, in fact, during the relevant time period launch such terrorist missile attacks.

71.    Hizbullah's missile attacks on civilians continued for over a month until a ceasefire was implemented by the United Nations and the parties and resolution adopted by the U.N. Security Council on August 14, 2006.

AUGUST 2, 2006 MISSILE ATTACK

72.    David Martin Lelchook (52 years-old), a United States citizen and civilian, was murdered on August 2, 2006, while riding his bike at Kibutz Sa-ar, located in the State of Israel.

73.     He was on his bike heading toward the safe room in his house from the kibbutz fields where he worked, when a terrorist missile launched by Hizbullah struck him.

74.     David was gravely injured by shrapnel from the initial blast, causing permanent and severe injuries and subsequently resulting in and causing his death.

75.     David Martin Lelchook is survived by two daughters, both United States citizens, Plaintiffs, Michal Lelchook, and Yael Lelchook.

76.     David Martin Lelchook is survived by his wife, Plaintiff Ester Lelchook, an Israeli citizen.

77.     David Martin Lelchook is survived by his brother, Plaintiff Alexander Lelchook and his mother, Doris Lelchook.

78.     Plaintiff Ester Lelchook was the first family member to receive notice of the attack.  Ester worked at a local hospital, while her husband worked in the fields on the kibbutz.  She had to contact her daughters, one of whom, Michal, was in Pittsburgh, PA and advise them of the death of their father.  Michal travelled with her uncle and grandmother, both of whom lived in the United States, for the funeral in Israel.

79.     Each of the Plaintiffs have suffered greviously from the terrorist murder of their loved one, David Martin Lelchook, to their loss and damage.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### AIDING AND ABETTING THE MURDER OR ATTEMPTED MURDER OR PHYSICAL VIOLENCE TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C § 2332(b); 18 U.S.C § 2332(c); AND 18 U.S.C. § 2333(a)

80.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

81.    Plaintiffs have been injured in their person by reason of the terrorist acts committed by Hizbullah that involve violence and are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

82.    The acts of Hizbullah in killing and attempting to kill U.S. nationals and other persons were intended to: (a) influence the policy of the United States by (i) intimidation or coercion, and (ii) mass destruction and murder; (b) intimidate or coerce the civilian population of Israel; (c) influence the policy of the Government of Israel by intimidation or coercion; and (d) affect the conduct of the Government of Israel by mass destruction and murder..

83.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the intention, design and plan to cause extreme physical pain and suffering, including death, to any and all persons within close proximity of the attacks and extreme emotional distress to the family members of those who were killed or injured by reason of the acts.

84.    Defendant is liable for the aforementioned violations of law in that they aided and abetted Hizbullah by intentionally facilitating the planning, preparation or execution of Hizbullah's conduct by providing organized and systematic financial and other practical assistance, encouragement or moral support that had a substantial effect on the perpetration of the attacks, intending, knowing, or consciously or recklessly avoiding knowing that their actions would assist Hizbullah in the commission of the attacks.

85.    Defendant knew or consciously avoided knowing that Hizbullah's conduct was a breach of the Defendant's duties yet provided Hizbullah with substantial assistance or

encouragement and/or gave substantial assistance to Hizbullah in accomplishing its tortious and terrorist conduct and tortiuous result and Defendant's own conduct, separately considered, breached duties to Plaintiffs.

86.     The financial services that the Defendant knowingly provided to Hizbullah by collecting and transmitting funds to and on behalf of Hizbullah assists Hizbullah in its recruiting, rewarding, supporting, encouraging, enabling and providing incentives to suicide bombers and other terrorists. These financial services facilitate acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries and/or death to the Plaintiffs.

87.     The Defendant knew or should have known that it had provided material support to Hizbullah, a Foreign Terrorist Organization, and knew that Hizbullah commits horrific terrorist attacks of the kind that have maimed and murdered American citizens such as the Plaintiff, David Lelchook.

88.     Throughout the period in which it has provided financial support for the benefit of Hizbullah, Defendant was, and to this date remains, aware or should have known that Hizbullah collects and receives funds transmitted and collected by Defendant and that Hizbullah has committed numerous criminal and terrorist acts, including the missile attacks and other acts of international terrorism that have injured and killed American citizens, and others, including Plaintiffs.

89.     Because it aided and abetted violations of 18 U.S.C. § 2332 that have caused each of the Plaintiffs to be injured in his or her person and property, and to their damage, the Defendant is liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that Plaintiffs have sustained as a result of the murder of David Martin Lelchook and injuries to the Plaintiffs, and each of them.

## SECOND CLAIM FOR RELIEF

### COMMITING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) and 18 U.S.C § 2333(a)

90.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

91.     By knowingly providing financial services and other meaningful assistance to Hizbullah, the Defendant has provided material support to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

92.     As stated above, The Orphans Project Lebanon, and the Martyrs Foundation are major and material funding sources for Hizbullah.

93.     By providing a wide range of vital financial services to this entity, Defendant substantially assisted Hizbullah in its recruiting, rewarding, supporting, enabling and providing incentives and rewards to suicide bombers, other terrorists and their families.

94.     Defendant knows of Hizbullah's terrorist activities.

95.     Defendant knows that Hizbullah had been designated as a Foreign Terrorist Organization by the Government of the United States.

96.     Defendants knows or should have known that as early as 2004, based on the reports from the German State of Baden-Württemberg that the "Waisenkinderprojekt Libanon e.V." (Orphans Project Lebanon) was collecting money for Hizbullah, a Foreign Terrorist Organization.

97.     By knowingly providing material support to a designated Foreign Terrorist Organization, the Defendant is civilly liable for damages to the Plaintiffs for their injuries, and the murder of David Martin Lelchook, pursuant to 18 U.S.C. § 2333(a).

### THIRD CLAIM FOR RELIEF

### COLLECTING AND PROVIDING FUNDS FOR THE FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C and 18 U.S.C § 2333(a)

98.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

99.     Defendant willfully and unlawfully provides financial services to Hizbullah, by collecting, receiving, transmitting and providing funds through accounts it maintains for The Orphans Project Lebanon with the knowledge that such funds have been, and will be, used, in part, to facilitate, aid, abet and support acts intended to cause death or serious bodily injury to civilians such as the Plaintiffs, and each of them, who have grievously suffered as a result of the terrorist acts described in this Complaint.

100.    The acts committed against the Plaintiffs were intended to: (a) influence the policy of the United States by (i) intimidation or coercion, and (ii) mass destruction and murder; (b) intimidate or coerce the civilian population of Israel; (c) influence the policy of the Government of Israel by intimidation or coercion; and (d) affect the conduct of the Government of Israel by mass destruction and murder..

101.    Therefore, Defendant is liable to each of the Plaintiffs who have suffered death and/or injuries to their person and property by reason of such acts under 18 U.S.C. § 2333(a) all to their damage.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Enter judgment against the Defendant and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial;

(b) Enter judgment against the Defendant and in favor of each Plaintiff for treble damages in amounts to be determined at trial;

(c) Enter judgment against the Defendant and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(d) Enter an Order declaring that the Defendant has violated, and is continuing to violate the Antiterrorism Act, 18 U.S.C. § 2331 et seq.;

(e) Assign this matter to a trial by jury;

(f) Grant leave to the Plaintiffs to amend this Complaint as the interest of justice allow; and

(g) Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated this July 29th 2010.                    Respectfully submitted,

                                              HEIDEMAN NUDELMAN & KALIK, P.C.
                                              1146 19th Street, NW
                                              Fifth Floor
                                              Washington, D.C. 20036
                                              Telephone: (202) 463-1818
                                              Facsimile: (202) 463-2999

                                              By: _____
                                                  Noel J. Nudelman