**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ALEXANDER LELCHOOK, ESTER LELCHOOK,
THE ESTATE OF DAVID MARTIN LELCHOOK,
MICHAL LELCHOOK, YAEL LELCHOOK, and
DORIS LELCHOOK,

                Plaintiffs,

    v.

COMMERZBANK AG,

                Defendant.

Civil Action No. 10-cv-5795 (AKH)

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

---

**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, New York 10119
Telephone (212) 613-2000
Facsimile (212) 554-9661
Terry Myers
Jeffrey L. Nagel
Paul A. Saso
Daniel S. Weinberger

*Attorneys for Defendant Commerzbank AG*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL ALLEGATIONS .................................................................................................... 4

LEGAL ARGUMENT .............................................................................................................. 5

I.    PLAINTIFFS' CLAIMS MUST BE DISMISSED BECAUSE DAVID
      LELCHOOK'S INJURIES RESULTED FROM AN ARMED
      CONFLICT ................................................................................................................ 6

      A.   The ATA Does Not Allow A Private Cause Of Action For Injuries
           Sustained By Reason Of An Act Of War ....................................................... 6

      B.   Plaintiffs' Alleged Injuries Were A Result Of An Act Of War
           Within The Meaning Of 18 U.S.C. § 2331(4) .............................................. 8

II.   PLAINTIFFS LACK STANDING TO SUE COBA UNDER THE ATA .......... 18

      A.   Plaintiffs' Alleged Injuries Are Not Fairly Traceable To COBA's
           Alleged Conduct ......................................................................................... 18

      B.   Certain Plaintiffs Are Not "Heirs" Or "Survivors" Under The ATA ...... 21

III.  PLAINTIFFS' AIDING AND ABETTING CLAIM UNDER THE ATA
      (COUNT I) MUST BE DISMISSED AS A MATTER OF LAW ...................... 22

      A.   The ATA Does Not Recognize A Civil Cause Of Action For
           Aiding And Abetting ................................................................................... 23

      B.   Plaintiffs Fail To Plead The Elements Of An Aiding And
           Abetting Claim ........................................................................................... 24

IV.   PLAINTIFFS' PRIMARY LIABILITY CLAIMS UNDER THE ATA
      (COUNTS II AND III) MUST BE DISMISSED AS A MATTER OF
      LAW ...................................................................................................................... 27

      A.   There Is No Breach Of A Duty Because Plaintiffs Fail To Allege
           An Act Of "International Terrorism" By COBA As Required By
           The ATA ...................................................................................................... 28

           1.   COBA's Alleged Conduct Was Not a Crime and Did Not
                "Involve Violent Acts or Acts Dangerous to Human Life"
                as Required by Section 2331(1)(A) ............................................... 29

           2.   COBA's Alleged Conduct Did Not "Appear to be
                Intended" to Have a Terrorist Effect as Required Under
                Section 2331(1)(B) ........................................................................ 33

      B.   Plaintiffs Fail To Allege That COBA Had The State Of Mind
           Required By Section 2333(a) Of The ATA ................................................ 34

## <u>TABLE OF CONTENTS</u>
(continued)

Page

C.    Plaintiffs Fail to Allege That COBA's Conduct Proximately Caused Their Injuries As Required By The ATA .................................. 36

V.    EXTENDING ATA LIABILITY TO COBA WOULD BE CONSTITUTIONALLY IMPERMISSIBLE ...................................... 39

CONCLUSION ................................................................................................ 48

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

<u>CASES</u>

*Abecassis v. Wyatt,*
  No. H-09-3884, 2010 WL 1286871 (S.D. Tex. Mar. 31, 2010) ............................................. 24

*Allen v. Wright,*
  468 U.S. 737 (1984) ................................................................................................... 18, 19

*Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,*
  436 F.3d 82 (2d Cir. 2006) ............................................................................................. 5

*Almendarez-Torres v. United States,*
  523 U.S. 224 (1998) ...................................................................................................... 32

*Arthur Andersen LLP v. United States,*
  544 U.S. 696 (2005) ...................................................................................................... 44

*Ashcroft v. Iqbal,*
  129 S.Ct. 1937 (2009) ........................................................................................... passim

*Bassam v. Holder,*
  338 Fed. Appx. 507 (6th Cir. 2009) ............................................................................... 17

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................... passim

*Boim v. Holy Land Foundation for Relief & Dev.,*
  549 F.3d 685 (7th Cir. 2008) ............................................................................. 23, 27, 34

*Boim v. Quranic Literacy Institute,*
  291 F.3d 1000 (7th Cir. 2002) ........................................................................... 23, 27, 36

*Bulgartabac Holding AD v. Republic of Iraq,*
  No. 08-cv-6502, 2010 U.S. Dist. LEXIS 99077 (S.D.N.Y. Sept. 21, 2010) ........................... 9

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1984) ...................................................................................................... 23

*Chahoud v. Holder,*
  390 Fed. Appx. 35 (2d Cir. 2010) .................................................................................. 17

*Chhertry v. U.S. Dep't of Justice,*
  490 F.3d 196 (2d Cir. 2007) ........................................................................................... 8

*Culver v. McRoberts,*
  192 F.3d 1095 (7th Cir. 1999) ....................................................................................... 31

*DeLuca v. Gallo,*
   287 A.D.2d 222, 735 N.Y.S.2d 596 (2d Dep't 2001) ........................................................ 22

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London,*
   147 F.3d 118 (2d Cir. 1998) .................................................................................................. 5

*First Nationwide Bank v. Gelt Funding Corp.,*
   27 F.3d 763 (2d Cir. 1994) .................................................................................................. 36

*FW/PBS, Inc. v. Dallas,*
   493 U.S. 215 (1990) ............................................................................................................ 18

*Goldberg v. UBS AG,*
   660 F. Supp. 2d 410 (E.D.N.Y. 2009) ................................................... 24, 26, 30, 38

*Greenberg v. Bush,*
   150 F. Supp. 2d 447 (E.D.N.Y. 2001) ................................................................................ 19

*Habchy v. Filip,*
   552 F.3d 911 (8th Cir. 2009) .............................................................................................. 17

*Halberstam v. Welch,*
   705 F.2d 472 (D.C. Cir. 1983) ........................................................................................... 24

*Hecht v. Commerce Clearing House, Inc.,*
   897 F.2d 21 (2d Cir. 1990) .................................................................................................. 36

*Holder v. Humanitarian Law Project,*
   130 S. Ct. 2705 (2010) .................................................................................................. 30, 31

*Holmes v. Securities Investor Protection Corp.,*
   503 U.S. 258 (1992) ...................................................................................................... 36, 39

*In re Chiquita Brands Int'l, Inc.,*
   690 F. Supp. 2d 1296 (S.D. Fl. 2010) ............................................................................... 23

*In re Iraq & Afghanistan Detainees Litig.,*
   479 F. Supp. 2d 85 (D.D.C. 2007) ....................................................................................... 8

*In re Terrorist Attacks on September 11, 2001,*
   349 F. Supp. 2d 765 (S.D.N.Y. 2005) ........................................................................ passim

*In re Terrorist Attacks on September 11, 2001,*
   No. 03 MD 1570, 2010 U.S. Dist. LEXIS 96597 (S.D.N.Y. Sept. 13, 2010) ..................... 6

*Kiobel v. Royal Dutch Petroleum Co.,*
   Nos. 06-4800-cv & 06-4876-cv, 2011 U.S. App. LEXIS 2200 (2d Cir. Feb. 4, 2011) ........... 46

*La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya,*
  533 F.3d 837 (D.C. Cir. 2008) ........................................................................... 7

*Lerner v. Fleet Bank, N.A.,*
  459 F.3d 273 (2d Cir. 2006) ............................................................................. 39

*Licci v. Am. Express Bank Ltd.,*
  No. 08 CV 7253, 2010 U.S. Dist. LEXIS 32873 (S.D.N.Y. Mar. 31, 2010) ......................... 37

*Linde v. Arab Bank PLC,*
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) ........................................................... 24, 28

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ................................................................................. 18, 19

*McBoyle v. United States,*
  283 U.S. 25 (1931) ...................................................................................... 44

*Mekhael v. Mukasey,*
  509 F.3d 326 (7th Cir. 2007) ........................................................................ 17

*Morgan Guaranty Trust Co. v. Republic of Palau,*
  924 F.2d 1237 (2d Cir. 1991) .......................................................................... 8

*Morrison v. Nat'l Austl. Bank Ltd.,*
  130 S.Ct. 2869 (2010) .................................................................................. 40

*Mouawad v. Gonzales,*
  479 F.3d 589 (8th Cir. 2007) ........................................................................ 17

*Pacheco v. Serendensky,*
  393 F.3d 348 (2d Cir. 2004) .......................................................................... 42

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
  No. 05 Civ. 9016, 2007 U.S. Dist. LEXIS 11807 (S.D.N.Y. Feb. 20, 2007) ......................... 36

*Prosecutor v. Tadic,*
  No. IT-94-1-I, Decision on Defence Motion for Interlocutory Appeal on Jurisdiction
  (Int'l Crim. Trib. for the Former Yugoslavia Oct. 2, 1995) ...................................... 14

*Pryor v. Astrue,*
  No. 08-312, 2009 U.S. Dist. LEXIS 26010 (W.D. Pa. Mar. 27, 2009) .................................. 8

*Rescue Army v. Mun. Court,*
  331 U.S. 549 (1947) ...................................................................................... 41

*Rothstein v. UBS AG,*
  647 F. Supp. 2d 292 (S.D.N.Y. 2009) ........................................................... passim

*Rothstein v. UBS AG,*
    No. 08 Civ. 4414, 2010 U.S. Dist. LEXIS 139104 (S.D.N.Y. Dec. 30, 2010) ............. 4, 24, 25

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ........................................................................................................ 41

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) .......................................................................................................... 19

*Starr v. Sony BMG Music Entm't,*
    592 F.3d 314 (2d Cir. 2010) ............................................................................................. 6

*Strauss v. Credit Lyonnais, S.A.,*
    No. CV-06-0702, 2006 U.S. Dist. LEXIS 72649 (E.D.N.Y. Oct. 5, 2006) ............... 26, 30, 38

*Stutts v. De Dietrich Group,*
    No. 03-cv-4058, 2006 U.S. Dist. LEXIS 47638 (E.D.N.Y. June 30, 2006) ................. 7, 33, 35

*Tamam v. Fransabank SAL,*
    677 F. Supp. 2d 720 (S.D.N.Y. 2010) ............................................................................. 17

*Tel-Oren v. Libyan Arab Republic,*
    726 F.2d 774 (D.C. Cir. 1984) ........................................................................................ 43

*Trainmen* v. *Baltimore & Ohio R. Co.,*
    331 U.S. 519 (1947) ........................................................................................................ 32

*United States v. Caicedo,*
    47 F.3d 370 (9th Cir. 1995) ............................................................................................. 44

*United States v. Jin Fuey Moy,*
    241 U.S. 394 (1916) ........................................................................................................ 42

*United States v. Klimavicius-Viloria,*
    144 F.3d 1249 (9th Cir. 1998) ......................................................................................... 43

*United States v. Rosero,*
    42 F.3d 166 (3d Cir. 1994) ............................................................................................... 7

*United States v. Weingarten,*
    No. 09-2043-cr, 2011 WL 135763 (2d Cir. Jan. 18, 2011) ................................... 40, 41, 42, 43

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ........................................................................................... 8, 43

*Valley Forge Christian College v. Americans United for Separation of Church and
    State, Inc.,*
    454 U.S. 464 (1982) ........................................................................................................ 18

*Vaughn v. Air Lines Pilots Ass'n Int'l,*
   604 F.3d 703 (2d Cir. 2010) ............................................................ 5, 25

*Weiss v. Nat'l Westminster Bank PLC,*
   453 F. Supp. 2d 609 (E.D.N.Y. 2006) ................................. 24, 26, 30, 38

*Wultz v. Islamic Republic of Iran,*
   No. 08-cv-1460, 2010 U.S. Dist. LEXIS 111469 (D.D.C. Oct. 20, 2010) ...................... passim

## STATUTES

18 U.S.C. § 2 ......................................................................................... 23, 24

18 U.S.C. § 2331 ........................................................................ 1, 6, 28, 33

18 U.S.C. § 2332 ............................................................................................ 22

18 U.S.C. § 2333 ...................................................................................... passim

18 U.S.C. § 2336 .............................................................................................. 6

18 U.S.C. § 2339B ....................................................................... 1, 2, 29, 30

18 U.S.C. § 2339C ................................................................................... passim

22 U.S.C. § 2656f ......................................................................................... 30

50 U.S.C. §§ 1701 *et seq.* ............................................................................ 4

8 U.S.C. § 1189 ............................................................................................ 30

C.F.R. § 594.101 ......................................................................................... 45

N.Y. Estates, Power and Trusts Law § 4-1.1(a)(4) and (5) ....................... 22

## OTHER AUTHORITIES

132 Cong. Rec. S1382 (1986) ................................................................... 42

147 Cong. Rec. E2397
   (daily ed. Dec. 19, 2001) ...................................................................... 32

Brilmayer, Lea, & Charles Norchi,
   *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv. L. Rev. 1217
   (1992) ................................................................................................... 43

Common Article 2 of the 1949 Geneva Convention ................................. 13

Designation of Foreign Terrorist Organizations,
   62 Fed. Reg. 52650 (Oct. 8, 1997)..........................................................................4

Executive Order 12947 (Jan. 23, 1995) ......................................................................4

Executive Order 13224 (Sept. 23, 2001) ...............................................................4, 45

H.R. Conf. Rep. No. 102-405 (1991)..........................................................................42

H.R. Rep. No. 107-307 (2001)....................................................................................32

*Implementation of the International Convention for the Suppression of the Financing of
   Terrorism: Hearing on H.R. 3275 Before the Subcomm. on Crime of the H. Comm. on
   the Judiciary*, 107th Cong. 10 (2001) (statement of Samuel M. Witten, Acting Deputy
   Legal Adviser, Dep't of State)................................................................................33

Restatement (Second) of Torts § 876(b) .....................................................................24

## **RULES**

Fed. R. Civ. P. 12(b)(1).................................................................................................5

Fed. R. Civ. P. 12(b)(6).................................................................................................5

Fed. R. Evid. 201(b).......................................................................................................8

## PRELIMINARY STATEMENT

Plaintiffs seek to hold defendant Commerzbank AG ("COBA") liable for treble damages under U.S. antiterrorism laws for the death of David Lelchook.  The Complaint alleges that Mr. Lelchook suffered fatal injuries from a missile attack launched by Hezbollah on Israel as part of a thirty-four day armed conflict between Israel and Lebanon between July 12 and August 14, 2006.  The hostilities resulted in over 5,000 Lebanese deaths or injuries, nearly one million displaced Lebanese citizens, and 159 Israeli military and civilian casualties.

COBA's alleged wrongdoing is that it maintained a bank account at one of its branches in Germany.  The account was allegedly held in the name of an association formed under German law as a charitable organization called Weisenkinderprojekt Libanon e.V (the "Orphans Project Lebanon" or "Orphans Project").  (Compl. ¶ 60).  The Orphans Project was not, at the time of Mr. Lelchook's death (and is not today), designated a terrorist organization by either the United States or Germany.  Plaintiffs allege, however, that the Orphans Project nevertheless was affiliated with Al-Shahid Social Association, also referred to as the Martyrs Foundation, which, in turn, allegedly operates "as a H[e]zbollah front and fundraising feeder organization."  (*Id.* ¶ 21).  The Martyrs Foundation, however, also was not a designated terrorist organization at either the time COBA maintained the account in question or at the time of Mr. Lelchook's death.

Based upon the existence of this bank account, plaintiffs allege three causes of action pursuant to a group of U.S. antiterrorism statutes collectively referred to as the "Antiterrorism Act" (the "ATA"),[1] which provide that a "national of the United States" injured "by reason of an

---

[1]     18 U.S.C. §§ 2331 and 2333-2338 were initially enacted in 1990 as the Antiterrorism Act of 1990, Pub. L. No. 101-519, § 132, 104 Stat. 2240, 2250, but were repealed and subsequently re-enacted as part of the Federal Courts Administration Act of 1992, Pub. L. No. 102-572, 106 Stat. 4506 (1992).  18 U.S.C. § 2339B was originally enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, § 303(a), 110 Stat. 1214, 1250, and was amended by, *inter alia*, the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), Pub. L. 108-458, § 6603, 118 Stat. 3638, 3762-3764.  18 U.S.C. § 2339C was enacted in 2002 as part of an act to implement the international Anti-Terrorist Conventions, including the International

act of international terrorism" may bring a claim in an appropriate U.S. federal district court. 18 U.S.C. § 2333(a).  Specifically, plaintiffs allege that: (1) COBA aided and abetted an act of international terrorism by Hezbollah in violation of 18 U.S.C. § 2333(a) (Count I); (2) COBA committed an act of international terrorism within the meaning of 18 U.S.C. § 2333(a) by violating 18 U.S.C. § 2339B, a criminal statute prohibiting material support to a Foreign Terrorist Organization (Count II); and (3) COBA committed an act of international terrorism within the meaning of 18 U.S.C. § 2333(a) by allegedly violating 18 U.S.C. § 2339C, a criminal statute prohibiting the provision or collection of funds with the knowledge that such funds will be used to carry out terrorist activity (Count III).  Each of these claims must be dismissed as a matter of law for multiple reasons.

*First*, plaintiffs impermissibly equate an "act of war" with "international terrorism."  The conflict in which David Lelchook was killed was not an act of international terrorism within the meaning of the relevant statutes, but rather a thirty-four day military conflict resulting in the loss of thousands of lives, a proclamation by Israel that it and Lebanon were at war, resolutions by the United Nations Security Council addressing the conflict, a U.N.-brokered ceasefire agreement, and the deployment of U.N.-backed troops to the Israeli-Lebanon border to help maintain peace.  The ATA does not apply to injuries sustained as a result of such an armed conflict.  *See infra* Argument Section I.  As such, COBA cannot be held liable under the ATA for plaintiffs' injuries.

*Second*, plaintiffs lack Article III standing.  Their injuries are too remote from, and not fairly traceable to, COBA's alleged conduct of maintaining a bank account in the name of a

---

Convention of the Suppression of the Financing of Terrorism, Pub. L. 107-197, § 202(a), 116 Stat. 721, 724.  For ease of reference we refer to all these statutes collectively as the ATA.

German charitable organization that has never been a designated terrorist organization or subject to any antiterrorist business restrictions.  *See infra* Argument Section II.

*Third*, plaintiffs' secondary liability claim (Count I)—based on a theory of aiding and abetting—fails because the ATA does not recognize such liability.  Moreover, even if an aiding and abetting claim could be made pursuant to the ATA, plaintiffs do not and could not plausibly allege the required elements for such secondary liability, such as a purposeful intention by COBA to substantially assist the terrorist activity of Hezbollah.  *See infra* Argument Section III.

*Fourth*, plaintiffs fail to allege in Counts II and III that COBA's conduct satisfies the elements of a primary liability claim under the ATA.  For example, to state such a claim plaintiffs must allege that COBA committed a predicate criminal act, but plaintiffs fail to allege the elements of any such crime.  Plaintiffs also do not and could not plausibly allege that COBA's maintenance of a bank account appeared intended to have any sort of terrorist effect.  Nor do they allege that COBA knew of the purported connection between the Orphans Project, the Martyrs Foundation, and Hezbollah as would be necessary for ATA liability.  Plaintiffs also do not plausibly allege that COBA's conduct had a sufficient causal nexus to the alleged injury. *See infra* Argument Section IV.

*Finally*, applying the ATA to COBA with respect to an account located in a German branch, where the organization holding the account is not a designated terrorist organization in either Germany or the United States, would raise serious constitutional questions about the scope of congressional authority to regulate conduct abroad and, under these circumstances, would violate the reasonable expectation and fair notice requirements of the Due Process Clause of the Fifth Amendment.  *See infra* Argument Section V.

In the end, the Complaint attempts to link together a chain of inferences about Hezbollah, the Martyrs Foundation, the Orphans Foundation, and COBA in order to impose liability under the ATA where none exists, and in doing so "stretch[es] the law beyond all recognizable limits." *Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 293 (S.D.N.Y. 2009) (*Rothstein I*) (dismissing ATA claim on the pleadings), *judgment reaffirmed after remand*, *Rothstein v. UBS AG*, No. 08 Civ. 4414, 2010 U.S. Dist. LEXIS 139104 (S.D.N.Y. Dec. 30, 2010) (*Rothstein II*).  The case should be dismissed in its entirety.

## FACTUAL ALLEGATIONS

The specific missile attack that killed David Lelchook allegedly was launched by Hezbollah on August 2, 2006, weeks after the start of hostilities on July 12, 2006.  (Compl. ¶¶ 72-74).  His surviving spouse, Ester, as well as Mr. Lelchook's brother (Alexander), daughters (Michal and Yael) and mother (Doris) filed this lawsuit.  (*Id.* ¶ 6).  At the time of Mr. Lelchook's death, the Orphans Project Lebanon, an association formed under German law as a charitable organization, maintained a bank account at a German branch of COBA.  (Compl. ¶ 60).  The Orphans Project allegedly is affiliated with Al-Shahid Social Association, also referred to as the Martyrs Foundation.  (*Id.* ¶ 21).  The Martyrs Foundation, in turn, allegedly operates "as a H[e]zbollah front and fundraising feeder organization."  (*Id.*).

In the United States, Hezbollah is a designated Foreign Terrorist Organization ("FTO") as well as a Specially Designated Terrorist ("SDT") and a Specially Designated Global Terrorist ("SDGT") under various federal regulations and Executive Orders.  (Compl. ¶¶ 52-57).[2]  The Martyrs Foundation became an SDGT in July 2007, about a year after Mr. Lelchook's death.

---

[2]      *See, e.g.*, Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52650 (Oct. 8, 1997) (designation of Hezbollah as an FTO by U.S. Secretary of State); International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-07 (authorizing the President to issue terrorist designations); Executive Order 12947 (Jan. 23, 1995) (naming certain SDTs); Executive Order 13224 (Sept. 23, 2001) (designation of certain SDGTs).

(Compl. ¶ 57).  The Orphans Project is not and never has been an FTO, SDT, or SDGT in the United States and is not listed on any comparable "watch list" in Germany.  Nevertheless, the Complaint alleges that a connection between the Orphans Project and the Martyrs Foundation was the subject of certain government reports in Germany starting around May 2004.  (*Id.* ¶¶ 29-33).  There is no allegation that COBA received these or any other government report concerning the Orphans Project or had any obligation to be aware of or to take action based upon them.

## **LEGAL ARGUMENT**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face.[3]  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1947 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949.  To be plausible, the Complaint must contain claims consisting of "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 1965.  The requirement to plead facts, not just conclusions, applies to allegations of a defendant's intent as well as its conduct.  *Iqbal*, 129 S. Ct. at 1954.

The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully."  *Vaughn v. Air Lines Pilots Ass'n Int'l*, 604 F.3d 703, 709 (2d Cir. 2010)

---

[3]	In addition to the deficiencies of the Complaint addressed herein under Fed. R. Civ. P. 12(b)(6), plaintiffs' lack of Article III standing as discussed *infra* at Argument Section II and failure to satisfy due process as discussed *infra* at Argument Section V require that the Complaint be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.  *See, e.g., Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006) ("Although we have noted that standing challenges have sometimes been brought under Rule 12(b)(6), as well as Rule 12(b)(1) . . . , the proper procedural route is a motion under Rule 12(b)(1)."); *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 124 n.4, 127-32 (2d Cir. 1998) (dismissing securities fraud claim for lack of subject matter jurisdiction where the claim was based on an "entirely foreign" transaction).

(quoting *Iqbal*, 129 S. Ct. at 1949) (internal quotation marks omitted).   Allegations that are "merely consistent" with a defendant's liability "stop short of the line between possibility and plausibility of entitlement to relief."   *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).   "Where the complaint merely pleads facts giving rise to an inference of a defendant's possible wrongdoing, the claims against that defendant must be dismissed."   *In re Terrorist Attacks on September 11, 2001*, No. 03 MD 1570, 2010 U.S. Dist. LEXIS 96597, at *81 (S.D.N.Y. Sept. 13, 2010) *("Terrorist Attacks V")* (citing *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).   Moreover, dismissal is required where there is an "obvious alternative explanation" for the defendant's conduct that does not involve wrongdoing.   *Twombly*, 550 U.S. at 567; *Iqbal*, 129 S. Ct. at 1951.

## I.   PLAINTIFFS' CLAIMS MUST BE DISMISSED BECAUSE DAVID LELCHOOK'S INJURIES RESULTED FROM AN ARMED CONFLICT

### A.   The ATA Does Not Allow A Private Cause Of Action For Injuries Sustained By Reason Of An Act Of War

Congress precluded claims under the ATA for any injury, like David Lelchook's, resulting from an "act of war" as defined by those statutes.   Specifically, the ATA provides that: "No action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war."   18 U.S.C. § 2336(a).   The ATA defines an "act of war" to mean:

> Any act occurring in the course of
>
> (A)   declared war;
>
> (B)   armed conflict whether or not war has been declared, between two or more nations; or
>
> (C)   armed conflict between military forces of any origin.

18 U.S.C. § 2331(4).

The definition of an "act of war" under the ATA includes more than conflicts involving declarations of war and more than conflicts between nation states.  Indeed, Section 2331(4)(C) defines an act of war broadly to include any armed conflict between military forces of "any origin."   The language of the ATA thus contemplates that even armed conflict outside the parameters of conventional warfare nevertheless will be excluded from the statutes.  *See, e.g., Stutts v. De Dietrich Group*, No. 03-cv-4058, 2006 U.S. Dist. LEXIS 47638, at *18-20 (E.D.N.Y. June 30, 2006) (applying the "act of war" exclusion to dismiss ATA claims based upon injuries occurring and as a result of "friendly fire" after the ceasefire in the Persian Gulf War).

The missile attack at issue occurred during a thirty-four day conflict that falls squarely within each of the ATA's alternative definitions of an "act of war."  Although Congress has not offered guidance as to the precise meaning of the three "act of war" definitions, the critical terms "declared war," "armed conflict . . . between . . . nations" and "armed conflict between military forces" are well-known within the realm of international law, and pursuant to canons of construction this Court should look to international law to interpret the ATA's "act of war" provisions.  "When Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word."  *La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 533 F.3d 837, 844 (D.C. Cir. 2008) (internal citation omitted); *United States v. Rosero*, 42 F.3d 166, 170-71 (3d Cir. 1994) (holding that where Congress uses terms that have a settled meaning, a court must interpret the statute to incorporate those established meanings).  "This same principle logically applies when Congress uses a term that has acquired a settled meaning under customary international law."  *Rosero*, 42 F.3d at 171.   Where there is no

controlling domestic law with respect to the interpretation of the text of a statute, courts may also look to "the general usage and practice of nations. . . ."  *United States v. Yousef*, 327 F.3d 56, 93 (2d Cir. 2003) (internal citation omitted).  And "where legislation is susceptible to multiple interpretations, the interpretation that does not conflict with 'the law of nations' is preferred."  *Id.* at 92.  A court may interpret a statute to have a contradictory meaning to international law only where "the affirmative intention of the Congress [to contradict international law] is clearly expressed."  *Id.* at 93 (internal citation omitted).

All three "act of war" definitions under the ATA are met here.  The conflict at issue was a declared war by Israel and was treated as a war in government statements by both Israel and Lebanon, as well as by Germany and the United States.  Moreover, Israel, Lebanon, and the larger international community through United Nations reports and resolutions acknowledged that it was an armed conflict between Israel and Lebanon.  Finally, at a bare minimum, the conflict certainly was between opposing military forces.

**B.     Plaintiffs' Alleged Injuries Were A Result Of An
Act Of War Within The Meaning Of 18 U.S.C. § 2331(4)**

Lebanon's open warfare with Israel, including the specific series of missile attacks during the thirty-four day period from July 12 to August 14, 2006 referenced in the Complaint, is often referred to as the "Second Lebanon War" and is properly classified as an "act of war" under ATA Section 2331(4) for at least the following reasons:[4]

---

[4]     This Court may take judicial notice of the historic facts concerning this conflict because they are either generally known or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).  In this Circuit, courts may take judicial notice of news articles when they are from "reputable news organizations" and the accuracy of the reports are undisputed.  *Chhetry v. U.S. Dep't of Justice*, 490 F.3d 196, 200 (2d Cir. 2007).  It is also proper for courts to take judicial notice of facts relating to wars.  *See, e.g.*, *In re Iraq & Afghanistan Detainees Litig.*, 479 F. Supp. 2d 85, 102 (D.D.C. 2007) (taking judicial notice of the state of war with Iraq and Afghanistan); *Pryor v. Astrue*, No. 08-312, 2009 U.S. Dist. LEXIS 26010, at *23 (W.D. Pa. Mar. 27, 2009) (taking judicial notice of Iraq's war tactics during the Persian Gulf War).  The Second Circuit has also held that it is appropriate to take judicial notice of the actions of the United Nations Security Council.  *Morgan Guaranty Trust Co. v. Republic of Palau*, 924 F.2d 1237, 1244 (2d Cir. 1991); *see also*

- Israel's Prime Minister declared war, the leaders of both Israel and Lebanon acknowledged that the conflict was a war between them, and statements by the German and United States governments also referred to the conflict as a war;

- The conflict involved military forces from both Israel and Lebanon;

- Israel targeted not just Hezbollah-held positions and units during the conflict, but a wide array of Lebanese infrastructure, with both Israel and Lebanon suffering significant casualties, both military and civilian;

- The international community, through reports and resolutions by the United Nations, treated the conflict as one between Israel and Lebanon;

- The ceasefire was negotiated and implemented by Israel and Lebanon with the assistance of the United Nations;

- The Israeli army, the Lebanese army, and the militias and paramilitary units that were trained, armed and directed by Hezbollah are "military forces"; and

- Other United States federal courts have discussed and referred to the 2006 hostilities as an armed conflict and not a "terrorist attack."

*First*, Israel's Prime Minister declared war with Lebanon, both Israel and Lebanon acknowledged that the conflict was between them, and statements by both the German and United States governments referred to the conflict as a war.

Prime Minister Ehud Olmert made clear that the hostilities were a conflict between two nations, not an Israeli response to a terrorist attack.[5]  In his July 12, 2006 press conference, for example, he declared that:

> This morning, actions were carried out against [Israel Defense Force] soldiers in the north. . . . I want to make it clear:  This morning's events were *not a terrorist attack*, but the *action of a sovereign state* that attacked Israel for no reason and without provocation.  The Lebanese government, of which Hezbollah is a member, is trying to undermine regional stability.  *Lebanon is responsible and Lebanon will bear the consequences of its actions.*

---

*Bulgartabac Holding AD v. Republic of Iraq*, No. 08-cv-6502, 2010 U.S. Dist. LEXIS 99077, at *12 (S.D.N.Y. Sept. 21, 2010).

[5]      In Israel, the executive branch is authorized to declare war.  (Nagel Decl. ¶ 28, Ex. AA (Israeli Basic Law, at ¶¶ 1 and 40(a))).   All references to the "Nagel Decl." are to the Declaration of Jeffrey L. Nagel submitted simultaneously with and in support of Defendant's Motion to Dismiss.

\* \* \*

> One thing must be understood: This was an *act of war* without any provocation on the sovereign territory—about which there is no dispute—of the State of Israel.[6]

Similarly, a July 12, 2006 Special Israeli Cabinet Communiqué affirmed that "Israel views the sovereign Lebanese Government as responsible for the action that originated on its soil and for the return of the abducted soldiers to Israel."[7]  And Israel's Northern Commander Udi Adam was quoted at the time as saying that "this affair is between *Israel and the State of Lebanon*.  Where to attack?  Once it is inside Lebanon, everything is legitimate— . . . not just the line of H[e]zbollah posts."[8]  The Israel Defense Force viewed its operations in Lebanon "as an international armed conflict."[9]

The Israeli Knesset and Israel Ministry of Foreign Affairs also refer to the conflict as the Second Lebanon War.[10]  And after the conflict ended, "[t]he [Israeli] Cabinet approved the decision by the Ministerial Committee on Symbols and Ceremonies that [the conflict between Israel and Lebanon in 2006] would be known as the Second Lebanese War."[11]

---

[6]     Nagel Decl. ¶ 2, Ex. A (transcript of Israeli Prime Minister Ehud Olmert's July 12, 2006 press conference (emphasis added)).

[7]     Nagel Decl. ¶ 3, Ex. B (July 12, 2006 Special Israeli Cabinet Communiqué (referring to the conflict as the "Second Lebanon War")).

[8]     Nagel Decl. ¶ 4, Ex. C ("Implementation of General Assembly Resolution 60/251 of 15 March 2006 entitled 'Human Rights Council,'" Report of the Commission of Inquiry on Lebanon pursuant to the United Nations Human Rights Council Resolution S-2/1, dated Nov. 23, 2006, at ¶ 43 (the "HRC Report") (emphasis added)).

[9]     *Id.* ¶ 62.

[10]     Nagel Decl. ¶ 5, Ex. D (page from Israeli Knesset website); Nagel Decl. ¶ 6, Ex. E (page from Israel Ministry of Foreign Affairs website).

[11]     Nagel Decl. ¶ 7, Ex. F; Nagel Decl. ¶ 9, Ex. H ("Israeli Government Chooses 'The Second Lebanon War,'" Reuters, dated Mar. 25, 2007).

The Lebanese government likewise classified the conflict as one between Israel and Lebanon.[12]  Thus, both Israel and Lebanon described the hostilities as a war between the two nations.

Statements by the German and United States governments also recognized that the conflict was a war.  For example, in responding to questions by the German parliament, the German Bundestag issued written public documents (referred to as "Bundestagsdrucksache") that repeatedly referred to the hostilities as an armed conflict or a "krieg", *i.e.*, a "war."[13]

And in the United States, military and civilian officials referred to the conflict as a war, both at the time of the conflict and since.  Thus, in an August 16, 2006 op-ed article describing United Nations Security Council Resolution 1701, which established a cease fire and sought to set up a framework for peace in the future, Secretary of State Condoleezza Rice wrote, "Our diplomacy has helped *end a war*."[14]  In a press interview the day before, she noted that the resolution "recognized that … Hezbollah was *the trigger for this war*."[15]  Brigadier General Carl Jensen, who was in charge of the evacuation of American citizens from Lebanon, also explained in the early days of the conflict how "*the war has significantly impacted* the telecommunications

---

[12]     Nagel Decl. ¶ 13, Ex. L (Higher Relief Commission Daily Situation Report, dated Oct. 3, 2005).

[13]     Nagel Decl. ¶ 29, Ex. BB (Bundestagsdrucksache ("BT-Drucks") 16/4709, pp. 1, et seq.); Nagel Decl. ¶ 30, Ex. CC (BT-Drucks 16/9763, pp. 1, *et seq.*); Nagel Decl. ¶ 31, Ex. DD (BT-Drucks 16/6320, p. 1, *et seq.*).  Certified translations to select portions of this material are included as part of these exhibits.

[14]     Nagel Decl. ¶ 32, Ex. EE ("A Path to Lasting Peace," Op-Ed, U.S. Secretary of State Condoleezza Rice, The Washington Post, Aug. 16, 2006) (emphasis added)).  Earlier in the op-ed, she had used the same term in describing the role of Syria and Iran, who, she said, "have sought to prolong and intensify the war that Hezbollah started."  *Id.*

[15]     Nagel Decl. ¶ 33, Ex. FF (transcript of interview of U.S. Secretary of State Condoleezza Rice by Susan Page of USA Today, Aug. 15, 2006).  Elsewhere in the interview, she stated that the resolution had branded Hezbollah as an aggressor "because they launched the war," and, referring to changing international and Arab attitudes during the month of fighting, she said, "[n]ow, it's true, as the war went on, there was more and more emotion."  *Id.*

capability of southern Lebanon."[16]  Current public government documents about the conflict also refer to the events as a "war."[17]

*Second*, the conflict involved military forces from both Israel and Lebanon.  It is well documented that the conflict involved confrontation between the Israeli and Lebanese military forces, not just Hezbollah units.  The Lebanese army deployed to the border "for the first time in 30 years" and the Lebanese Army commander General Michel Suleiman ordered his troops to "confront the Israeli aggressions and violations with whatever potentials are on hand at present."[18]

*Third*, Israel targeted not just Hezbollah combatants during the conflict, but a wide array of Lebanese infrastructure, and both Lebanon and Israel suffered significant military and civilian casualties.  The Israel Defense Force "attacked the Lebanese Armed Forces and its assets (e.g., military airport at Qliat in northern Lebanon, all radar installations along the Lebanese coast, and the army barracks at Djamhour, 100 kilometers from the southern border with Israel)."[19]  During the course of Israel's military offensive, the Lebanese government reported[20] that Israel damaged or destroyed 3 Lebanese airports, 137 roads, 25 fuel stations, 107 bridges and overpasses, 30,000

---

[16]    Nagel Decl. ¶ 26, Ex. Y (transcript of U.S. Department of Defense News Briefing with Brig. Gen. Carl Jensen from Cyprus, July 26, 2006).

[17]    For example, the current State Department "Travel Warning" for Lebanon notes that "more than 40 civilians have been killed and over 300 injured by unexploded ordinance remaining from *the July-August 2006 Hizballah war*."  (Nagel Decl. ¶ 21, Ex. T (U.S. Department of State Bureau of Consular Affairs Travel Warning for Lebanon, Oct. 8, 2010) (emphasis added)).  The current State Department "Background Note" on Lebanon, in the section on "History," includes a paragraph headed "War with Israel – 2006."   The paragraph uses the term "war" consistently:  It says Hezbollah guerrilla attacks "precipitated a war with Israel," notes that "the war ended on August 14," refers to United Nations Security Counsel Resolution 1701 as having "ended the war," and reports that the "war temporarily or permanently displaced roughly one-fourth of Lebanon's population and caused enormous damage to homes, businesses, and infrastructure."  (Nagel Decl. ¶ 17, Ex. P (U.S. Dep't of State Bureau of Near Eastern Affairs Background Note on Lebanon, Oct. 25, 2010)).

[18]    Nagel Decl. ¶ 13, Ex. L.

[19]    Nagel Decl. ¶ 4, Ex. C ¶ 53.

[20]    The Higher Relief Commission, which prepared the report, is a Lebanese government institution and "is presided [over] by the Prime Minister [of Lebanon] and made up of members in the persons of the Ministers of Defense, Health, Social Affairs, Interior, Finance, Public Works, Energy and Housing."  (Nagel Decl. ¶ 14, Ex. M.)

private homes or apartments, 900 medium size and 2,800 small size commercial enterprises, 66 government buildings, 2 hospitals, 14 power generation stations and 4 army brigades.[21]

In the end, both Israel and Lebanon suffered serious casualties.  "The conflict resulted in 1,191 [Lebanese] deaths and 4,409 injured.  More than 900,000 people fled their homes."[22] Several reports indicate that "most" of the deaths suffered in Lebanon were civilian deaths.[23] Israel suffered 159 casualties—116 soldiers and 43 civilians.[24]  Clearly the scope of the casualties involved on both sides lends further support to the fact that the events were an armed conflict between nations.

*Fourth*, the international community treated the hostilities as an "armed conflict" between Israel and Lebanon and therefore subject to the rules of international law.  Analyzing whether international humanitarian law[25] and the dictates of the Geneva Conventions[26] applied to the

---

[21]     Nagel Decl. ¶ 13, Ex. L § 6.

[22]     Nagel Decl. ¶ 4, Ex. C ¶ 77.

[23]     Nagel Decl. ¶ 15, Ex. N ("Rights Group Accuses Hezbollah of 'Indiscriminate' Killing," Washington Post, Sept. 15, 2006); Nagel Decl. ¶ 16, Ex. O ("Israeli PM Faces Calls To Resign," BBC News, Jan. 17, 2007).

[24]     Nagel Decl. ¶ 16, Ex. O.

[25]     International humanitarian law may apply to two different types of armed conflict:  "International armed conflicts and conflicts of a non-international character."  (Nagel Decl. ¶ 18, Ex. Q (*Qualification of armed conflicts*, Rule of Law in Armed Conflicts Project)).  The Rule of Law in Armed Conflict Project ("RULAC Project") "is an initiative of the Geneva Academy of International Humanitarian Law and Human Rights to support the application and implementation of international law in armed conflict."  (Nagel Decl. ¶ 18, Ex. Q (page from the RULAC Project website)).

[26]     Common Article 2 of the 1949 Geneva Convention states that:  "[T]he present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them."  The International Committee of the Red Cross ("ICRC") commentary on this provision explains that:  "Any difference arising between two States and leading to the intervention of members of the armed forces is an armed conflict within the meaning of Article 2, even if one of the Parties denies the existence of a state of war.  It makes no difference how long the conflict lasts, or how much slaughter takes place.  The respect due to the human person as such is not measured by the number of victims." (Nagel Decl. ¶ 19, Ex. R, at 20-21 (ICRC Commentary on the Four Geneva Conventions of 1949)).  "Thus, it is generally agreed that a *single incident* involving the armed forces of two states may be sufficient to be considered an international armed conflict."  (*Id.*(emphasis added)).

Second Lebanon War, for example, the United Nations Human Rights Council[27] determined that the hostilities were an "armed conflict" and that the parties to that conflict included Israel, Lebanon and Hezbollah.[28]

As the United Nations Human Rights Council explained, "[a]n essential pre-condition for the application of international humanitarian law and the establishment of the applicable and governing rules, is a determination of the factual existence of an armed conflict, and its legal classification."[29]  The Human Rights Council specifically determined that the Second Lebanon War was an armed conflict for purposes of international humanitarian law:

> [I]t is well established in international humanitarian law that for the existence of an armed conflict the decisive element is the factual existence of the use of armed force. . . . [T]here is authority for the proposition that an armed conflict exists whenever there is a resort to armed force between States or protracted armed violence between governmental authorities and organized armed groups or between such groups within a State. . . . On the basis of the factual circumstances of the conduct of the hostilities that took place, including the intensity of the violence and the use of armed force, the Commission is of the view that *the existence of an armed conflict during the relevant period has been sufficiently established.*[30]

According to the Human Rights Council, "[t]he fact that Israel considered Hezbollah a terrorist organization and its fighters as terrorists did not influence the [HRC's] qualification of the conflict.  Several official declarations of the Government of Israel addressed Lebanon as

---

[27]     The U.N.'s Human Rights Council was established by U.N. General Assembly resolution 60/215 of 15 March 2006.  The HRC is the successor organization to the U.N.'s Commission on Human Rights.  (Nagel Decl. ¶ 20, Ex. S (U.N. General Assembly resolution 60/215 of 15 March 2006)).

[28]     Nagel Decl. ¶ 4, Ex. C ¶¶ 51 and 55; *see also Prosecutor v. Tadic*, No. IT-94-1-I, Decision on Defence Motion for Interlocutory Appeal on Jurisdiction, ¶ 70 (Int'l Crim. Trib. for the Former Yugoslavia Oct. 2, 1995) (The International Criminal Tribunal for the former Yugoslavia concluded that a non-international armed conflict "exists whenever there is a resort to armed force between States or protracted armed violence between governmental authorities and organized armed groups or between such groups within a State.").  The Second Lebanon War clearly meets this definition of armed conflict.

[29]     Nagel Decl. ¶ 4, Ex. C ¶ 50.

[30]     Nagel Decl. ¶ 4, Ex. C ¶ 51 (emphasis added).

assuming responsibility."[31]   Moreover, the fact that some hostilities were primarily between the Israeli Defense Force and Hezbollah formations did not alter the HRC's conclusion that an armed conflict existed and that international law applied.[32]   In reaching this conclusion, the HRC relied on the fact that (1) "Hezbollah is a recognized political party" in Lebanon, (2) "for the public in Lebanon, resistance means Israeli occupation of Lebanese territory," and (3) "the State of Lebanon was the subject of direct hostilities conducted by Israel, consisting of such acts, as an aerial and maritime blockade . . . ."[33]   Thus, not only were Israel and Lebanon bound by the Geneva Conventions, but for purposes of this conflict, so was Hezbollah.[34]   The HRC concluded that "[t]he hostilities that took place from 12 July to 14 August [2006] constitute an international armed conflict to which conventional and customary international humanitarian law and international human rights law are applicable."[35]

*Fifth*, the ceasefire agreement ending the hostilities was negotiated and implemented by both Israel and Lebanon with the assistance of the United Nations, including the sending of troops from other countries.   Thus, United Nations Security Council Resolution 1701, which governed the ceasefire of the Second Lebanon War, was adopted by the Israeli and Lebanese governments.[36]   Resolution 1701 placed obligations on both the Israeli and Lebanese governments, including requiring the deployment of Lebanese soldiers and withdrawal of Israeli military forces.[37]   The involvement of the United Nations in ending the ongoing hostility, and the acceptance of U.N. Security Council resolutions by the governments of both Lebanon and Israel,

---

[31]     Nagel Decl. ¶ 4, Ex. C ¶ 62.

[32]     Nagel Decl. ¶ 4, Ex. C ¶ 55.

[33]     Nagel Decl. ¶ 4, Ex. C ¶¶ 56-58.

[34]     Nagel Decl. ¶ 4, Ex. C ¶ 60.

[35]     Nagel Decl. ¶ 4, Ex. C ¶ 314.

[36]     Nagel Dec. ¶ 22, Ex. U (United Nations Security Council Resolution 1701); *see also* Compl. ¶ 71.

[37]     Nagel Dec. ¶ 22, Ex. U.

is further evidence that the Second Lebanese War was an armed conflict between two nations and not a "terrorist attack."

*Sixth*, there is no serious question but that the fighting occurred between "military forces." The Israeli and Lebanese armies were engaged in the conflict, as were Hezbollah led and organized forces. And during the course of the conflict, Hezbollah reportedly launched approximately 100 rockets per day into Israel.[38] Indeed, the sophistication of the Hezbollah forces was of great concern to Israel and the international community during the conflict. As plaintiffs allege, "H[e]zbollah fired approximately 3,900 missiles at Israeli civilian populations centers." (Compl. ¶ 68). Reports indicate that both Iran and Syria supplied Hezbollah with "satellite communications and some of the world's best infantry weapons, including modern, Russian-made antitank weapons and Semtex plastic explosives, as well as the training required to use them effectively against Israeli armor."[39] One Israeli soldier reported that the Hezbollah soldiers were "trained and highly qualified" and "equipped with flak jackets, night-vision goggles, good communications. . . ."[40] "The Iranian Revolutionary Guards have helped teach Hezbollah how to organize itself like an army with special units for intelligence, antitank warfare, explosives, engineering, communications and rocket launching."[41] And during the course of the thirty-four day conflict, Hezbollah utilized an elaborate system of bunkers and

---

[38]      Nagel Decl. ¶ 23, Ex. V ("Israel Finding a Difficult Foe in Hezbollah," The New York Times, dated July 26, 2006).

[39]      Nagel Decl. ¶ 24, Ex. W ("A Disciplined Hezbollah Surprises Israel With Its Training, Tactics and Weapons," The New York Times, dated Aug. 7, 2006).

[40]      Nagel Decl. ¶ 24, Ex. W.

[41]      Nagel Decl. ¶ 24, Ex. W.

tunnels to "fire automatic rifles, rocket-propelled grenades and antitank rockets."[42]  Thus, the

Hezbollah fighters qualify as "military forces."

Finally, U.S. federal courts generally have referred to the Second Lebanon War as either

a war or an armed conflict.  See, e.g., Chahoud v. Holder, 390 Fed. Appx. 35, 36 (2d Cir. 2010)

(referring to the "2006 Israeli-Hezbollah War"); Tamam v. Fransabank SAL, 677 F. Supp. 2d

720, 723 (S.D.N.Y. 2010) (dismissing claim under the Alien Tort Statute against Lebanese banks

for lack of personal jurisdiction and characterizing the Second Lebanese War as "a thirty-four

day conflict between Israel and Hizbullah during which Hizbullah launched approximately 3,900

missiles at civilian areas in Israel"); Bassam v. Holder, 338 Fed. Appx. 507, 510 (6th Cir. 2009)

(referring to "the 2006 conflict between Israel and Lebanon"); Habchy v. Filip, 552 F.3d 911,

914 (8th Cir. 2009) (noting the "conflict between Lebanon and Israel that occurred during July

and August 2006"); Mouawad v. Gonzales, 479 F.3d 589, 596 (8th Cir. 2007) (noting the "well-

publicized armed conflict between Hizballah and Israeli forces during the summer of 2006");

Mekhael v. Mukasey, 509 F.3d 326, 327 (7th Cir. 2007) (describing the Second Lebanon War as

"full-scale warfare" that is not properly considered merely "cumulative" evidence in the ongoing

Middle East conflict, any more "than our Civil War was merely 'cumulative' evidence of

tensions between North and South that dated back to the constitutional convention of 1787").

Based upon the above historical record, it is clear that the ATA's "act of war" exclusion

is triggered here.  War was declared by Israel, and both Lebanon and Israel treated the conflict as

a war between them, thus satisfying the requirements of ATA Section 2331(4)(A).  Even if war

was not declared, the hostilities were undoubtedly viewed by Lebanon, Israel and the

international community as an armed conflict between those two countries; and a conflict as to

---

[42]     Nagel Decl. ¶ 25, Ex. X ("Israel's Wounded Describe Surprisingly Fierce, Well-Organized and Elusive Enemy," New York Times, dated Aug. 12, 2006).

which international laws of war applied, thus satisfying the requirements of ATA Section 2331(4)(B).  And certainly, at a minimum, the hostilities meet the broadest definition under ATA Section 2331(4)(C) of an "armed conflict between military forces of any origin."  The ATA claims against COBA therefore must be dismissed as a matter of law.

## II.   PLAINTIFFS LACK STANDING TO SUE COBA UNDER THE ATA

### A.   Plaintiffs' Alleged Injuries Are Not Fairly Traceable To COBA's Alleged Conduct

The Complaint must be dismissed because plaintiffs lack standing under both Article III of the Constitution and the statutory provisions of the ATA.  Article III of the Constitution limits the "judicial power" of the federal courts to the resolution of "cases" and "controversies."  *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982).  "The 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded."  *Allen v. Wright*, 468 U.S. 737, 750 (1984).  One of the "landmarks" of the "case or controversy" requirement is the doctrine of standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Without standing, a plaintiff cannot invoke the jurisdiction of the federal courts.  *Allen*, 468 U.S. at 750.  The plaintiffs bear the burden of establishing that they have standing.  *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

To establish Article III standing, plaintiffs must allege that: (1) they "suffered an injury-in-fact . . . which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical"; (2) there was a "causal connection between the injury and the conduct complained of"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560-61.  To satisfy the causal connection requirement, plaintiffs must show that their injury is "fairly traceable to the

challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (internal quotation marks and alterations omitted).  Standing is lacking where "the line of causation between the [defendant's alleged] illegal conduct and [plaintiff's] injury [is] too attenuated," *Allen*, 468 U.S. at 752, or where it is "purely speculative" whether the injury fairly can be traced to the action of the defendant.  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).

Plaintiffs cannot establish that their injuries are fairly traceable to COBA's alleged conduct.  The chain of alleged events between COBA's maintenance of the bank account and David Lelchook's death is far too attenuated to satisfy minimum constitutional standards.  To begin with, there are countless non-parties without whose "independent action" plaintiffs would not have been injured—starting with the individual members of Hezbollah who allegedly planned and carried out the missile attacks.  *See Lujan*, 504 U.S. at 560-61.  In addition, there are no allegations that the funds raised by the Orphans Project were "a primary or even relatively significant source of" funds for Hezbollah in general or for the missile attacks specifically. *Rothstein I*, 647 F. Supp. 2d at 294.

Additionally, in order to establish standing, plaintiffs must allege "facts from which it could be reasonably inferred that absent Defendants' alleged unlawful acts, there is a *substantial probability* that Plaintiffs would not have been [injured] by a third party."  *Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001) (emphasis added).  Yet plaintiffs have not even alleged that the funds maintained for the Orphans Project were used to finance military operations of any kind by Hezbollah, much less the attacks that allegedly caused plaintiffs' injuries.  At best, it is "purely speculative" whether any funds allegedly maintained by COBA for the Orphans Project ever reached Hezbollah, let alone whether those funds were used to finance

19

the missile attacks on Israel. Because their injuries cannot be "fairly trace[d]" to COBA's alleged conduct, plaintiffs lack Article III standing and their claims must be dismissed. *See Rothstein I*, 647 F. Supp. 2d at 294 ("[C]ash dollars have multiple legitimate uses besides funding terrorism.").[43]

This case is very much like *Rothstein I* in this respect. There, the plaintiffs were relatives of victims of terrorist attacks perpetrated by Hamas and Hezbollah in Israel, and they alleged that "UBS indirectly assisted the Government of Iran in financially supporting Hamas and Hezbollah and consequently is [civilly] liable to plaintiffs" under the ATA. 647 F. Supp. 2d at 293. Plaintiffs' allegations were premised on the fact that UBS had transferred U.S. currency to Iran and to Iranian "counterparties" in violation of regulations issued by the Office of Foreign Assets Control ("OFAC"). *Id.* at 294. Specifically, plaintiffs alleged that the Iranian government is a state sponsor of terrorism, that it funded Hamas and Hezbollah, that these terrorist organizations require U.S. cash dollars to carry out their activities, and that UBS's involvement in banknote transactions with Iranian counterparties had the effect of providing U.S. cash dollars to the Iranian government, which, in turn, supplied U.S. cash dollars to those terrorist organizations which used that money to facilitate terrorist acts. *Id.*

In granting UBS's motion to dismiss in *Rothstein I*, Judge Rakoff held that "[t]his chain of inferences . . . is far too attenuated to provide plaintiffs with sufficient standing to bring this action under federal law." *Id.* The court explained that there are at least three deficiencies in the causal chain: (1) the complaint did not allege that "UBS was a primary or even relatively

---

[43]     Indeed, plaintiffs allege that the Orphans Project is an organization that raises money for the "children and families of war victims" and so-called "martyrs." (*See* Compl. ¶¶ 20, 23-24, 31). And while people may disagree about the propriety of providing charity to the family members of so-called "martyrs," funds used for such purposes are not "fairly traced" to Hezbollah's missile attacks launched during the Second Lebanon War. *Cf. Wultz v. Islamic Republic of Iran*, No. 08-cv-1460, 2010 U.S. Dist. LEXIS 111469, at *17 (D.D.C. Oct. 20, 2010) (noting that because the Palestinian Islamic Jihad provides no social services and is "entirely devoted to terrorist activity," it was "unlikely to use wired moneys for any other purpose").

significant source of U.S. banknotes for the Iranian government"; (2) money has multiple legitimate uses besides funding terrorism; and (3) there were no specific allegations showing that the terrorist groups in question raised their funds from monies transferred from Iran.  *Id.*  Accordingly, the court concluded that "plaintiffs' allegations here are far too speculative to provide the plausible indication of proximate causation necessary to establish plaintiffs' standing in this case."  *Id.*  The same is true here.  There is no allegation that COBA was a primary or even relatively significant source of funds for Hezbollah, and there is no allegation that COBA ever transferred funds to Hezbollah (or even to the Martyrs Foundation for that matter).

And even assuming that funds held in the Orphans Project account at COBA reached Hezbollah, plaintiffs cannot plausibly allege that there is a substantial probability that the Second Lebanon War would not have occurred, or that Hezbollah would not have fired thousands of rocket missiles, much less the missile that killed David Lelchook, absent this one alleged bank account.  (*See* Compl. ¶ 19 (Hezbollah's "estimated enterprise value is worth billions of U.S. dollars.")).  *Cf. Wultz*, 2010 U.S. Dist. LEXIS 111469, at *14-15 (holding that plaintiffs had standing to sue the Bank of China for injuries caused by the suicide bombing at a restaurant in Tel Aviv where the bank allegedly executed dozens of wire transfers totaling several million dollars directly to the Palestinian Islamic Jihad, a known terrorist organization that was responsible for the suicide attack).  In short, there is no legal basis to find that plaintiffs have alleged a sufficient connection between COBA's actions and the alleged injury to meet the requirements of Article III standing.  The Complaint must therefore be dismissed.

### B.   Certain Plaintiffs Are Not "Heirs" Or "Survivors" Under The ATA

Apart from a lack of Article III standing, certain plaintiffs cannot bring their claim under the ATA because they do not qualify as the victim's "estate, survivors, or heirs."   18 U.S.C.

§ 2333(a).[44]   David Lelchook's brother, Alexander; his mother Doris; and his two daughters, Michal and Yael, fail to allege any facts to establish their capacity to bring claims under the statute.   None of them allege that they are David Lelchook's "heirs" or that they represent his "estate."   They do allege that they have "survived" David Lelchook.   (Compl. ¶¶ 75, 77).   But a "survivor" for purposes of tort law is typically someone entitled to receive compensation, or to be considered a distributee, upon the wrongful death of another.   *DeLuca v. Gallo*, 287 A.D.2d 222, 225-26, 735 N.Y.S.2d 596, 599 (2d Dept. 2001).   Under New York law, for example, parents and siblings do not stand to inherit unless the decedent was survived by neither a spouse or issue.   *See* N.Y. Estates, Power and Trusts Law § 4-1.1(a)(4) and (5).   Thus, this Court should dismiss plaintiffs Alexander, Doris, Michal and Yael Lelchook from this action.

## III.   PLAINTIFFS' AIDING AND ABETTING CLAIM UNDER THE ATA (COUNT I) MUST BE DISMISSED AS A MATTER OF LAW

Count I of the Complaint seeks to hold COBA liable under Section 2333 of the ATA for aiding and abetting the murder, attempted murder, and conspiracy to commit the murder of a United States national in violation of 18 U.S.C. § 2332.[45]   This aiding and abetting claim should be dismissed because, first, the ATA does not recognize a civil cause of action for aiding and abetting as a matter of law and, second, even if it did, plaintiffs have failed to allege the necessary elements of an aiding and abetting claim.

---

[44]     Plaintiffs allege that David Lelchook's wife, Ester Lelchook, brings this action in her individual capacity as David's heir and as the representative of the estate of David Lelchook under Israeli law.  (Compl. ¶ 6).  No facts are pled in support of these legal designations, but COBA here does not contest her capacity to sue as Mr. Lelchook's heir.

[45]     Section 2332(a)-(c) makes it a crime to kill, attempt to kill, or conspire to kill a United States national while such national is outside the United States.  18 U.S.C. § 2332(a)-(c).

## A.    The ATA Does Not Recognize A Civil Cause Of Action For Aiding And Abetting

The Seventh Circuit's *en banc* opinion in *Boim v. Holy Land Foundation for Relief & Dev.*, 549 F.3d 685, 689 (7th Cir. 2008) ("*Boim III*"), cogently explains why there is no civil aiding and abetting cause of action under the ATA (thus abrogating *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1010 (7th Cir. 2002) ("*Boim I*") on this point). In particular, the statute itself does not mention aiding and abetting:

> Section 2333 does not say that someone who assists an act of international terrorism is liable; that is, it does not mention "secondary" liability, the kind that 18 U.S.C. § 2 creates by imposing criminal liability on "whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission," or "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States."

*Boim III*, 549 F.3d at 689. This "statutory silence on the subject" means that there is no basis for finding a civil aiding and abetting cause of action under the statute. "[S]ection 2333(a) authorizes awards of damages to private parties but does not mention aiders and abettors or other secondary actors." *Id.* The Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1984), holding that § 10(b) of the Securities and Exchange Act of 1934 "does not reach aiding and abetting because it makes no reference to secondary liability" confirms the analysis. *Boim III*, 549 F.3d at 689.[46]

In addition, no legislative history indicates that Congress intended to create a civil claim for aiding and abetting under ATA Section 2333. Congress certainly was familiar with the terms "aiding and abetting" when it enacted the ATA, and it knew how to incorporate those terms into

---

[46]    We are aware of two cases, post-*Boim III*, that hold that the ATA recognizes a civil aiding and abetting claim. *Wultz*, 2010 U.S. Dist. LEXIS 111469, at *112; *In re Chiquita Brands Int'l, Inc.*, 690 F. Supp. 2d 1296 (S.D. Fla. 2010). Many other post-*Boim III* cases, as discussed *infra* in Argument Section III.B, assume without deciding that an aiding and abetting cause of action exists under the ATA and hold that the plaintiff failed to plead the claim.

the statute.  Congress did so with respect to various criminal provisions such as Section 2332.  *See* 18 U.S.C. § 2 (general aiding and abetting criminal statute).  Because Congress did not create civil aiding and abetting liability under Section 2333, Count I of plaintiffs' Complaint must be dismissed as a matter of law.

### B.   Plaintiffs Fail To Plead The Elements Of An Aiding And Abetting Claim

Even if ATA Section 2333 did create a civil cause of action for aiding and abetting, plaintiffs have failed to allege facts supporting the generally-recognized requirements for secondary liability.  Pleading a cause of action for civil aiding and abetting liability requires alleging (consistent with the *Twombly* and *Iqbal* pleading standard) both an underlying wrongful act and that the defendant knowingly and intentionally provided substantial assistance to the primary actor.  *See Rothstein II*, 2010 U.S. Dist. LEXIS 139104, at *5-6 (reaffirming decision in *Rothstein I* dismissing ATA claim and explaining that pleading an aiding and abetting theory requires "adequate allegations that the defendant not only knew that its funds would be used to sponsor terrorist acts by Hamas and Hezbollah, but also intended to do so") (internal quotation marks omitted).[47]  These elements have not been pled here.

---

[47]     *See also In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 828 (S.D.N.Y. 2005) *(Terrorist Attacks I)* (dismissing aiding and abetting ATA claim and noting that to support such a claim "plaintiff would have to allege that the defendant knew about the terrorists' illegal activities, the defendant desired to help those activities succeed, and the defendant engaged in some act of helping those activities"); *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) (aiding and abetting requires a wrongful act by the primary party, knowledge by the secondary actor of his role as part of the wrongful activity, and knowing and substantial assistance); Restatement (Second) of Torts § 876(b) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 425 (E.D.N.Y. 2009); *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 621 (E.D.N.Y. 2006); *Linde v. Arab Bank PLC*, 384 F. Supp. 2d 571, 584 (E.D.N.Y. 2005); *Abecassis v. Wyatt*, No. H-09-3884, 2010 WL 1286871, at * 37 (S.D. Tex. Mar. 31, 2010) (even assuming, without deciding, that secondary liability is available under the ATA, such a theory would be governed by the ordinary tort principles, which as to aiding and abetting, require the secondary actor to "*know* [] that the [primary actor's] conduct constitutes a breach of duty") (emphasis in original).

There are, not surprisingly, no allegations that COBA intended to assist Hezbollah in any terrorist activities, let alone the military strikes that caused David Lelchook's death.   The Complaint's allegations concerning COBA's "knowledge" are, moreover, nothing but conclusory statements about what COBA "should have known" about the Martyrs Foundation and, by extension, the Orphans Project.   (Compl. ¶¶ 64, 96).   Such allegations are insufficient to support either the intent or knowledge required to hold an actor liable for aiding and abetting. *See Wyatt*, 2010 WL 1286871, at *38 (dismissing ATA secondary liability claim on Rule 12(b)(6) motion because plaintiffs "have not sufficiently alleged that any defendant had the knowledge necessary for liability" and explaining that the "only relevant allegations are either wholly conclusory or inadequate"); *Rothstein II*, 2010 U.S. Dist. LEXIS 139104, at *5-6; *Terrorist Attacks I*, 349 F. Supp. 2d at 831-33 (dismissing on Rule 12(b)(6) motion ATA claims against banks alleged to have aided and abetted terrorists because there was "no basis for a bank's liability for injuries funded by money passing through it on routine banking business").

Nor do plaintiffs allege facts that would allow a plausible inference under *Twombly* that COBA acted with the intention of assisting Hezbollah in a missile attack.   It is much more plausible that the conduct of COBA—a large German bank—in maintaining a bank account for the Orphans Project was done as part of COBA's routine banking activity than as part of some plan to assist Hezbollah's terrorist activities.   The plausibility standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'"   *Vaughn*, 604 F.3d at 709 (quoting *Iqbal*, 129 S. Ct. at 1949).   Indeed, dismissal is required where there is an "obvious alternative explanation" for the defendant's conduct that does not involve wrongdoing.   *Twombly*, 550 U.S. at 567; *Iqbal*, 129 S. Ct. at 1951.   That is certainly the case here.

Finally, the assistance that COBA supposedly provided to Hezbollah falls far short of "substantial."   As several courts in this Circuit have recognized, "the mere maintenance of a bank account and the receipt or transfer of funds do not . . . constitute substantial assistance" for the perpetration of a violent act, including a terrorist attack.  *Weiss*, 453 F. Supp. 2d at 621; *Strauss v. Credit Lyonnais, S.A.*, No. CV-06-0702, 2006 U.S. Dist. LEXIS 72649, at *32 (E.D.N.Y. Oct. 5, 2006); *see also Goldberg*, 660 F. Supp. 2d at 425-26; *Terrorist Attacks I*, 349 F. Supp. 2d at 833 (holding that there was "no basis" for an aiding and abetting claim "for injuries funded by money passing through [the defendant bank] on routine banking business").

In *Goldberg*, for instance, the court held that defendant UBS had not provided "substantial assistance" for Hamas's terrorist acts even where the account at issue in that case was in the name of a designated terrorist group and even where plaintiffs alleged that the account was *the principal source* of funds that Hamas used to finance terrorist activities.  *Goldberg*, 660 F. Supp. 2d at 415-16.  The court explained that "[e]ven if . . . the defendant had knowledge of the designation of its client . . . as an SDGT . . . , and the designation of the payments' recipients as unlawful organizations by the Israeli government, defendant UBS's assistance to the overall terrorist scheme would still be insufficiently 'substantial' to warrant aiding and abetting liability."  *Id.* at 426.  The allegations in the present case fall far short of those deemed insufficient in *Goldberg*.  Here, plaintiffs allege only that COBA maintained a bank account for the Orphans Project and performed related routine banking services.  They do not allege that COBA transferred funds to Hezbollah or any other designated terrorist organization.  Nor do they allege that Hezbollah used any funds from the Orphans Project to finance the attack in question.  COBA's alleged conduct therefore could not, as a matter of law, rise to the level of "substantial assistance" of Hezbollah's activity, as would be required in order to sustain an

aiding and abetting claim.   For this additional reason, Count I of the Complaint must be dismissed.

## IV.  PLAINTIFFS' PRIMARY LIABILITY CLAIMS UNDER THE ATA (COUNTS II AND III) MUST BE DISMISSED AS A MATTER OF LAW

Counts II and III seek to hold COBA primarily liable for a terrorist act pursuant to 18 U.S.C. § 2333(a).  To do so, plaintiffs rely on what Judge Posner has described as a "chain of incorporations" theory.  *Boim III*, 549 F.3d at 690.  Under this theory, plaintiffs attempt to link a series of statutory provisions—from Section 2331(1) to Section 2339B and 2339C and ultimately back to Section 2333(a)—in order to allege that COBA's conduct in maintaining a bank account in Germany for the Orphans Project constituted an "act of international terrorism" by reason of which plaintiffs suffered injury.

Plaintiffs' chain of inferences, however, does not meet the necessary statutory requirements for liability under Section 2333(a), including the basic elements of tort law as incorporated therein.   Specifically, those elements include: (1) the breach of a duty, (2) the requisite state of mind, and (3) an injury proximately caused by the alleged conduct.  *See Wultz*, 2010 U.S. Dist. LEXIS 111469, at *71; *Boim I*, 549 F.3d at 689 (explaining that Section 2333 codifies "general common law tort principles").

Plaintiffs' factual allegations fall far short on each of these three basic tort elements. Indeed, plaintiffs' chain of inferences required to support liability, as applied to COBA's alleged conduct, is so utterly implausible on its face that it fails to satisfy the applicable *Twombly* and *Iqbal* pleading standard.

A.      **There Is No Breach Of A Duty Because Plaintiffs Fail To Allege An Act Of "International Terrorism" By COBA As Required By The ATA**

Plaintiffs fail to plead that COBA committed an "act of international terrorism" as required to establish a breach of duty under Section 2333(a). The term "international terrorism" is defined in 18 U.S.C. § 2331(1) and means activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended --
>
> (i) to intimidate or coerce a civilian population;
>
> (ii) to influence the policy of a government by intimidation or coercion; or
>
> (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

Plaintiffs fail to allege prongs (A) and (B). To establish prong (A), plaintiffs must plausibly plead that COBA committed *a crime involving violent acts or acts dangerous to human life*. *Id.* § 2331(1)(A). "[T]here is no claim under § 2333(a) absent a criminal act." *Linde*, 353 F. Supp. 2d at 331. To establish prong (B), plaintiffs must plausibly plead that COBA's conduct appeared intended to intimidate or coerce a civilian population, or to influence the policy of a government by intimidation or coercion, or to affect the conduct of a government by mass destruction, assassination or kidnapping. Plaintiffs do neither.

28

**1.    COBA's Alleged Conduct Was Not a Crime and
Did Not "Involve Violent Acts or Acts Dangerous
to Human Life" as Required by Section 2331(1)(A)**

Plaintiffs attempt to satisfy prong (A) of Section 2331(1) by alleging that COBA violated two criminal provisions of the ATA—Section 2339B (in Count II), which makes it a crime to "knowingly provide[] material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B, and Section 2339C (in Count III), which makes it a crime to "unlawfully and willfully provide[] or collect[] funds . . . with the knowledge that such funds are to be used, in full or part, to carry out . . . any . . . act intended to cause death or serious bodily injury to a civilian. . . . " 18 U.S.C. § 2339C. By referencing or incorporating these criminal provisions, plaintiffs try to meet the requirements of pleading an act of terrorism under Section 2333(a) as defined by Section 2331(1)(A). But plaintiffs' efforts fail for many reasons.

First, plaintiffs appear to assume, wrongly, that if they allege a violation of either Sections 2339B or 2339C they automatically satisfy every requirement of pleading a violation of international terrorism as defined by Section 2331(1). But that assumption is mistaken. Under Section 2331(1)(A), the relevant "activity" *itself* must involve a violent act or an act dangerous to human life in order to constitute an act of "international terrorism" and be a civil violation actionable under Section 2333. In some cases, violations of the criminal provisions of Section 2339B and Section 2339C do involve violent acts, but in other cases they do not. In this case, for example, even assuming that plaintiffs have pled a violation of either Section 2339B or Section 2339C—and (as discussed below) they have not—it does not mean that COBA's alleged conduct satisfied prong (A) of Section 2331(1) because the mere maintenance of a bank account for a charitable organization that was not on any government terrorism list simply does not "involve violent acts or acts dangerous to human life."

Second, COBA's alleged conduct violates neither criminal law Section 2339B nor Section 2339C. With respect to Section 2339B, the law specifically forbids the provision of resources *to an FTO*.[48] The Orphans Project is not alleged to have ever been an FTO, and to this day it is not so-designated. Therefore, at its most basic level, COBA's maintenance of a bank account for the Orphans Project is not a violation of criminal law under Section 2339B.[49]

Nor can plaintiffs establish that COBA violated 2339B merely by alleging that it *indirectly* provided material support to an FTO (*i.e.*, Hezbollah) by maintaining a bank account for the Orphans Project. *See United States v. Khan*, 309 F. Supp. 2d 789, 821 (E.D. Va. 2004) (Section 2339B only prohibits the provision of "material support and resources *directly to*" the FTO) (emphasis added); *see also Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2713, 2728 (2010) (noting that "the authority to designate an entity a 'foreign terrorist organization' rests with the Secretary of State" and explaining that "§ 2339B only applies to designated foreign terrorist organizations").[50] Because plaintiffs do not allege that COBA provided direct financing

---

[48]      A "foreign terrorist organization" is defined as "a designated terrorist organization" under Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189, an organization that "has engaged or engages in terrorist activity" or an organization that "has engaged or engages in terrorism." 18 U.S.C. § 2339B(a)(1). Section 2339B(a)(1) defines "engage in terrorist activity" by reference to section 212(a)(3)(B) of the Immigration and National Act, 8 U.S.C. § 1182(a)(3)[B], and defines "engage in terrorism" by reference to section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989, 22 U.S.C. § 2656f(d)(2).

[49]      Section 2339B also includes separate reporting provision and corresponding civil penalties relating to a financial institution's possession of an FTO's funds. This suggests that Congress did not intend to *criminalize* a bank's mere maintenance of an account for a customer. *See* 18 U.S.C. § 2339B(a)(2) ("Except as authorized by the Secretary [of the Treasury], any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, shall—(A) retain possession of, or maintain control over, such funds; and (B) report to the Secretary the existence of such funds in accordance with regulations issued by the Secretary."); 18 U.S.C. § 2339B(b) ("Any financial institution that knowingly fails to comply with subsection (a)(2) shall be subject to a civil penalty in an amount that is the greater of—(A) $50,000 per violation; or (B) twice the amount of which the financial institution was required under subsection (a)(2) to retain possession or control.").

[50]      We recognize that certain ATA cases out of the United States District Court for the Eastern District of New York suggest that a Section 2333(a) claim may proceed on the basis of an alleged Section 2339B violation where the provision of financial services is made to an entity allegedly controlled by, or that was an agent or alias of, an existing FTO. *See Goldberg*, 660 F. Supp. 2d at 432-33; *Strauss*, 2006 U.S. Dist. LEXIS 72649, at *34-37; *Weiss*, 453 F. Supp. 2d at 622-23. These cases, however, all pre-date and are inconsistent with the Supreme Court's recent decision in *Humanitarian Law Project* concerning the scope and application of Section 2339B.

services to Hezbollah, they have not alleged facts that would constitute a violation of Section 2339B.

Finally, plaintiffs' allegations fail to meet the *mens rea* requirement of Section 2339B, which makes it a crime to "knowingly" provide material support or resources to a foreign terrorist organization.  *See Humanitarian Law Project*, 130 S. Ct. at 2717 ("Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism.").  In this case, plaintiffs allege only that COBA "knew or should have known" that the Orphans Project was affiliated with the Martyrs Foundation, and by extension, with Hezbollah.  (Compl. ¶¶ 61, 96).  Allegations of constructive knowledge are no substitute for actual knowledge under a specific intent criminal statute like Section 2339B.  *See*, *e.g., Culver v. McRoberts*, 192 F.3d 1095, 1099 (7th Cir. 1999) (dismissing claim under Indiana Dram Shop Act because "[t]he statutory requirement that the provider 'knows that the other person is intoxicated,' cannot be satisfied by evidence of . . . constructive knowledge").  Plaintiffs' failure to allege actual knowledge is fatal to any claim based on an alleged violation of Section 2339B.

Nor does plaintiffs' citation to criminal Section 2339C satisfy the "criminal act" requirement of Section 2331(1)(A).  Section 2339C requires that the actor "unlawfully and willfully provide[] or collect funds . . . with the knowledge that such funds are to be used, in full or part, to carry out . . . any . . . act intended to cause death or serious bodily injury to a civilian." In this case, plaintiffs assert in conclusory fashion that COBA "willfully and unlawfully provides financial services to Hezbollah, by collecting, receiving, transmitting and providing funds through accounts it maintains for The Orphans Project Lebanon with the knowledge that such funds have been used, and will be used, in part, to facilitate, aid, abet and support acts intended

to cause death or serious bodily injury to civilians such as the Plaintiffs."   (Compl. ¶ 99).

However, the only arguably plausible conclusions that can be drawn from the *facts* alleged are

that COBA maintained a bank account for the Orphans Project and "should have known" of its

customer's connection to the Martyr's Foundation, which in turn was affiliated with Hezbollah.

Maintaining such an account does not constitute knowingly providing financing for terrorism, as

required for criminal liability under Section 2339C.   The plain language of Section 2339C

requires actual knowledge that the funds are intended to be used to commit a terrorist act.

Plaintiffs plead no such knowledge on the part of COBA.

   In addition, the title of Section 2339C is "[p]rohibitions against the *financing* of

terrorism."   18 U.S.C. § 2339C (emphasis added).   That is telling.   *See Almendarez-Torres v.*

*United States*, 523 U.S. 224, 234 (1998) ("'[T]he title of a statute and the heading of a section'

are 'tools available for the resolution of a doubt' about the meaning of a statute.") (quoting

*Trainmen* v. *Baltimore & Ohio R. Co.*, 331 U.S. 519, 528-529 (1947)).   The legislative history of

Section 2339C substantiates the conclusion that it is directed at the knowing financing of

terrorism.   The purpose of Section 2339C was to implement the International Convention for the

Suppression of the Financing of Terrorism (the "Convention") and to criminalize fundraising for

terrorism.   H.R. Rep. No. 107-307, at 6-7 (2001); *see also* 147 Cong. Rec. E2397 (daily ed. Dec.

19, 2001) (statement of Rep. Sheila Jackson-Lee) ("H.R. 3275 implements the International

Convention for the Suppression of the Financing of Terrorism, which requires signatories to

prosecute or extradite *people who contribute to, or collect money for*, terrorist groups."

(emphasis added)); *Implementation of the International Convention for the Suppression of the*

*Financing of Terrorism: Hearing on H.R. 3275 Before the Subcomm. on Crime of the H. Comm.*

*on the Judiciary*, 107th Cong. 10 (2001) (statement of Samuel M. Witten, Acting Deputy Legal

Adviser, Dep't of State) ("[T]he Convention will obligate states to criminalize conduct related to the *raising of money* and other assets to support terrorist activities." (emphasis added)). Plaintiffs do not, and cannot, allege that COBA contributed money to or engaged in the collection of money for the Orphans Project Lebanon.  COBA's maintenance of a bank account into which the Orphans Project Lebanon deposited funds that it collected from its contributors is, *per se*, not financing.

Nor is there any allegation whatsoever that COBA "provided" financing to a designated terrorist organization—*i.e.*, by "giving, donating, and transmitting" funds.  *See* 18 U.S.C. § 2339C(e)(4).  Section 2339C, both through its title and its legislative history, demonstrates that this criminal provision is directed against those who actually finance terrorism.  There is no reason to believe that Congress intended to criminalize the provision of routine banking services for customers who are not designated terrorist organizations and where the bank did not transfer funds to any designated terrorist organization.

### 2. COBA's Alleged Conduct Did Not "Appear to be Intended" to Have a Terrorist Effect as Required Under Section 2331(1)(B)

Not only do plaintiffs' "act of terrorism" allegations fall far short of satisfying the violence and criminal definitional requirements of Section 2331(1)(A), those allegations also fail to satisfy the requirement of Section 2331(1)(B) that the defendant's conduct "appear[ed] to be intended" to intimidate civilians, influence a government's policy or affect its conduct. *See Wultz*, 2010 U.S. Dist. LEXIS 111469, at *93 ("After pleading violations of U.S. criminal law [including Sections 2339B and 2339C], plaintiffs must continue their allegations that [the defendant] committed an act of international terrorism by alleging the appearance of [the defendant's] intention to intimidate civilians, influence government policy, or affect government conduct.") (*citing* 18 U.S.C. § 2331(1)(B)); *Stutts*, 2006 U.S. Dist. LEXIS 47638, at *12

(dismissing ATA claim against foreign banks where there were no allegations that "their actions [were] designed to coerce civilians or government entities as required under § 2331[(1)(B)]").

Plaintiffs do not allege that COBA's conduct meets the requirements of Section 2331(1)(B), nor could plaintiffs plausibly do so given the facts alleged, which are equally (if not much more so) consistent with the legal provision of routine banking services than with acts intended to intimidate or coerce.  Allegations that are "'merely consistent'" with a defendant's liability "'stop short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).  For this additional reason, plaintiffs' allegations that COBA committed an "act of international terrorism" within the meaning of Section 2331(1) fail, and as such Counts II and III of the Complaint must be dismissed as a matter of law.

### B. Plaintiffs Fail To Allege That COBA Had The State Of Mind Required By Section 2333(a) Of The ATA

Even if plaintiffs could establish a breach of a duty by adequately alleging that COBA committed an act of international terrorism as defined by Section 2331, their primary liability claims nevertheless must be dismissed because they fail to plead that COBA had the requisite intent.  Because Section 2333(a) is a punitive tort statute that provides for trebling of damages, it requires "intentional misconduct" on the part of the tortfeasor.  *Boim III*, 549 F.3d at 693; *Wultz*, 2010 U.S. Dist. LEXIS 111469, at *99.  Allegations that COBA "knew or should have known" of the Orphans Project's alleged indirect ties to Hezbollah cannot satisfy that standard as a matter of law.[51]  (*See* Compl. ¶¶ 61, 96).

---

[51]     As discussed above, *see infra*, Argument Section IV.A.1, these allegations also fail to meet the *mens rea* requirements for finding any alleged criminal violation of Section 2339B or Section 2339C or the *scienter* requirements for a civil aiding and abetting claim.

Plaintiffs have alleged neither that COBA intended to support Hezbollah nor that it intended to further Hezbollah's (or anyone else's) violent terrorist activities. And even if specific intent were not required, plaintiffs have not alleged that COBA had actual knowledge that it was providing material support to, or collecting funds for, Hezbollah, let alone that it was providing material support for a terrorist attack. Plaintiffs appear to contend that primary liability can be established simply by alleging that COBA "knew or should have known" that its banking services for the Orphans Project would in some indirect manner benefit Hezbollah, regardless of how remote those services were from the conduct of Hezbollah itself, let alone the missile attacks that allegedly caused plaintiffs' injuries.

It would go too far for the Court to hold that a bank may be subject to primary liability under the ATA for committing an "act of international terrorism" without having the requisite intent and knowledge required to support a terrorist organization or its terrorist activities. As one court in the Southern District has noted, such a theory would "stretch the law beyond all recognizable limits." *Rothstein I*, 647 F. Supp. 2d at 293; *see also Terrorist Attacks I*, 349 F. Supp. 2d at 832-33 (rejecting allegations that the defendant banks "had to know that the charities it supported . . . were really fronts for al Qaeda," holding that the plaintiffs "do not offer facts to support their conclusions," and dismissing ATA claims because there was "no basis for a bank's liability for injuries funded by money passing through it on routine banking business"); *Stutts*, 2006 U.S. Dist. LEXIS 47638, at *24, 48-51, 54 (plaintiffs' "wide-sweeping allegation that the bank defendants 'knew, or reasonably should have known'" that their financial services supported Saddam Hussein's regime were insufficient to survive a motion to dismiss, even under pre-*Twombly* standards); *cf. Wultz*, 2010 U.S. Dist. LEXIS 111469, at *99-108 (holding that an ATA claim under Section 2333(a) requires actual knowledge and finding allegations of

knowledge sufficient where the defendant bank was effecting wire transfers to the Palestinian Islamic Jihad and government officials told the bank that the funds were being used for terrorism).  In short, plaintiffs fail to plead the mental state required to impose direct liability against COBA under ATA Section 2333.

### C. Plaintiffs Fail to Allege That COBA's Conduct Proximately Caused Their Injuries As Required By The ATA

Plaintiffs' primary liability claims also must be dismissed because Plaintiffs cannot establish that they were injured "by reason of" COBA's conduct.  18 U.S.C. § 2333(a); *Boim I*, 291 F.3d at 1015; *Rothstein I*, 647 F. Supp. at 295.  The Supreme Court has interpreted the "by reason of" language in a statute to require a showing of proximate cause.  *See, e.g.*, *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 265-68 (1992).   In order to establish proximate cause, plaintiffs must show that: (1) the defendants' conduct was "a substantial factor in the sequence of responsible causation" and (2) the alleged injury was "'reasonably foreseeable or anticipated as a natural consequence" of that conduct.  *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) (*quoting Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23-24 (2d Cir. 1990)); *see also Terrorist Attacks I*, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005).   And post-*Twombly*, conclusory allegations of proximate cause will not suffice.  *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05 Civ. 9016, 2007 U.S. Dist. LEXIS 11807, at *37-38 (S.D.N.Y. Feb. 20, 2007) (dismissing tort claims because "conclusory assertions" of proximate cause were insufficient to establish that defendant's actions were a "substantial factor in the sequence of responsible causation").  Plaintiffs do not meet these pleading requirements.

As an initial matter, because plaintiffs cannot establish causation for Article III standing purposes (*see* Argument Section II), "it follows *a fortiori* that they fail to adequately plead

[proximate] causation" as required by the "by reason of" language in Section 2333.  *Rothstein I*, 647 F. Supp. at 295.

Moreover, plaintiffs have not asserted facts that plausibly suggest that COBA's conduct was "a substantial factor in the sequence of responsible causation" or that plaintiffs' injuries were a "reasonably foreseeable" consequence of that conduct.  All plaintiffs allege is that COBA allowed the Orphans Project—an entity at least twice removed from Hezbollah—to maintain a bank account in Germany.  Plaintiffs make no allegation concerning the amount of funds at issue, or how much of such funds went to the Martyrs Foundation, or to Hezbollah, or how the maintenance of the account was otherwise a "substantial factor" in assisting Hezbollah's multi-billion dollar organization (*see* Compl. ¶ 19) or in financing rocket missile attacks during the Second Lebanon War.  *See, e.g., Licci v. Am. Express Bank Ltd.*, No. 08 CV 7253, 2010 U.S. Dist. LEXIS 32873, at *23-24 (S.D.N.Y. Mar. 31, 2010) ("Even if it were alleged that Hizbollah used some funds it received to carry out the 2006 missile attacks, that factual assertion alone would not make every financial transaction traceable to a Hizbollah-controlled entity, no matter how remote, the proximate cause of those attacks.").

Equally as important, it was not "reasonably foreseeable" that COBA's alleged conduct would result in an injury caused by a rocket missile attack launched during a month-long armed conflict.  COBA cannot be held liable for injuries during such a conflict because COBA could not have reasonably anticipated the conflict, let alone anticipated that its maintenance of a bank account for an organization that has never been designated as a terrorist organization helped finance that conflict.

Indeed, the Martyrs Foundation, the organization allegedly affiliated with both the Orphans Foundation and Hezbollah, and thus the alleged "link" between the two, itself was not

designated a terrorist organization by the Untied States until nearly a year after the 2006 missile attack.  (Compl. ¶ 57).  *See Weiss*, 453 F. Supp. 2d at 626 n.12 ("[D]efendant is correct that designations of organizations as terrorist groups which occurred after the relevant bank transfers cannot demonstrate that [the bank] had knowledge of the group's terrorist identity when it provided material support to an FTO.").  Thus, there were no government terrorist designations that COBA could have checked, or pursuant to which it could reasonably have foreseen its customer's ties to a terrorist organization.

This is in stark contrast to other ATA cases involving banking organizations that proceeded past the motion to dismiss stage on a primary liability theory under Section 2333.  In *Goldberg*, for example, the plaintiffs alleged that the defendant bank transferred funds from its client, a designated SDGT, to an organization that was designated an "unlawful organization" by the Israeli government because it was controlled by Hamas.  660 F. Supp. 2d at 430.  In *Strauss*, the plaintiffs alleged that the defendant transferred funds on behalf of its customer, a designated "unlawful organization" by the Israeli government, to other entities that likewise had been designated "unlawful organizations" by the Israeli government.  2006 U.S. Dist. LEXIS 72649, at *47.  And in *Wultz*, the plaintiffs alleged that the defendant bank transferred funds on behalf of its client directly to a designated FTO that engages solely in terrorist activity.  2010 U.S. Dist. LEXIS 111469, at *16-17, 109-10.  Thus, in each of those cases, the defendant either transferred funds *directly from* a designated terrorist organization, transferred funds *directly to* such an organization, or both.  *See Goldberg*, 660 F. Supp. 2d at 430; *Strauss*, 2006 U.S. Dist. LEXIS, at *47; *Wultz*, 2010 U.S. Dist. LEXIS 111469, at *109-10.  No such allegation is made here.

The allegations of the Complaint, even if true, thus would not establish a proximate causal connection between COBA's conduct and plaintiffs' injury sufficient to find primary

liability under ATA Section 2333.  A finding of proximate cause in this context would, in effect, require a bank to be an insurer for tort damages caused by any third-party associated with its customers. Citing Justice Scalia's concurrence in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. at 287, the Second Circuit has appropriately noted, "[l]ife is too short to pursue every known act to its most remote consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 287 (2d Cir. 2006).  Counts II and III of the Complaints must be dismissed as a matter of law.

## V.     EXTENDING ATA LIABILITY TO COBA<br>WOULD BE CONSTITUTIONALLY IMPERMISSIBLE

There are multiple reasons, set forth above, that the Court should not interpret the ATA to reach so far as to subject a bank to liability for maintaining an account outside of the United States for a non-U.S. customer that is not designated a foreign terrorist organization.  If, however, this Court were to accept plaintiffs' unprecedented and expansive construction of the ATA and apply the statute to COBA's alleged conduct, such application of the ATA would violate the Constitution.

Initially, the Complaint, in invoking the extraterritorial application of the ATA statute to COBA, raises the dual issues of whether such application is consistent both with congressional intent and with the reasonable expectation requirements of the Fifth Amendment's Due Process Clause.  It is beyond dispute that Congress has the authority to, and often does, pass domestic legislation that is intended to apply to extraterritorial conduct.  When doing so, however, the intent of Congress must be clear.  Courts must be careful to interpret the meaning of such laws so as to avoid difficult constitutional questions about the scope of congressional power to legislate foreign conduct having absolutely no nexus with the United States, which necessarily gives rise

to concerns about the due process requirement that a party have a reasonable expectation that they will be subject to the law in question.  Recently, both the U.S. Supreme Court and this Circuit addressed these issues.

In *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869, 2877 (2010), a case involving the interpretation of certain securities laws to sales abroad, the Supreme Court explained that there is a canon of statutory construction that creates a presumption against the extraterritorial application of a domestic statute, and therefore a "clear statement" by Congress is required to overcome that presumption.  Thus, even where a statute refers, for example, to regulating "foreign" commerce, it does not necessarily apply to conduct abroad absent clear congressional intent that such conduct be covered.  *Id.* at 2882.

The ATA certainly makes reference to foreign conduct.  It specifically provides a claim for certain victims injured by reason of an act of "international terrorism" which, by definition, involves terrorist acts committed outside of the United States.  But that does not end the inquiry.  That Congress intended the ATA to provide victims with a cause of action based on injuries from acts of terrorism committed abroad does not necessarily extend the scope of the ATA to any foreign actor regardless of how unconnected their conduct is to the United States, or how many steps removed they are from the terrorist organization that allegedly carried out the attack.

The Second Circuit addressed an analogous situation recently in *United States v. Weingarten*, No. 09-2043-cr, 2011 WL 135763 (2d Cir. Jan. 18, 2011).  In that case, the court had to decide whether a federal criminal statute prohibiting "travel in foreign commerce" with the intent to engage in illicit sexual activity with a minor applied extraterritorially and, if it did, whether the statute went so far as to criminalize certain travel by a U.S. citizen that occurred wholly between two foreign countries without any territorial nexus to the United States.

Taking due account of *Morrison*, the *Weingarten* Court first held that there was a clear intent by Congress that the criminal statute would apply extraterritorially.  *Id.* at *5 (noting Congress' "concern with conduct that occurs overseas" and its intent to criminalize travel abroad undertaken with the intent to commit sexual acts with a minor where such conduct "would be" in violation of U.S. law if the activity occurred within the "territorial jurisdiction of the United States").  But that was not the end of the matter.  As the *Weingarten* Court explained, a second step in the analysis is required in order to address the scope of a statute's extraterritorial application to a particular set of facts:

> Our conclusion that [the statute applies extraterritorially] is not dispositive as to the question before us.  Although we hold that [the statute] is applicable to conduct occurring outside the United States, it remains to be determined whether the specific conduct for which Weingarten was convicted …—travel for the purpose of engaging in a sexual act with his minor daughter where such travel was between two foreign nations, and without any territorial nexus to the United States—falls within [the scope of the statute].

*Id.* at *7.  Analyzing that question, the *Weingarten* Court concluded the statute's reference to prohibiting "travel in foreign commerce" (with the illicit intent to commit sexual acts with a minor) was at best ambiguous in scope, and thus limited the statute's application to travel abroad that also "involv[ed] some nexus to the United States."  *Id.* at *9-10.  In reaching this conclusion, the Second Circuit noted that its construction of the statute so as to not apply to extraterritorial conduct without any nexus to the United States "appropriately avoids the necessity of addressing whether such an exercise of congressional power would comport with the Constitution."  *Id.* (citing *Rescue Army v. Mun. Court*, 331 U.S. 549, 569 (1947)) (noting canon of statutory construction that "constitutional issues affecting legislation will not be determined . . . if a construction of the statute is fairly possible by which the question may be avoided"); *see also Rust v. Sullivan*, 500 U.S. 173, 191 (1991) ("'[A] statute must be construed, if fairly possible, so

as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.'") (quoting *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916)); *Pacheco v. Serendensky*, 393 F.3d 348, 355 (2d Cir. 2004).

Interpreting the scope of the ATA in this case must follow the same two-step process explained by the Second Circuit in *Weingarten*. Although the ATA is intended to have some extraterritorial application in the sense of giving victims a cause of action for terrorist activity occurring abroad, the question still remains whether the ATA reaches COBA's activity here, where the "terrorist" conduct alleged *as against COBA* is not the launching of a missile attack that killed David Lelchook, but the maintenance of a foreign bank account in the name of a foreign entity having no alleged connection to the United States and having never been a designated terrorist organization.

It is far from clear that Congress ever intended the ATA to allow a civil cause of action based on that type of conduct. Indeed, the legislative history with respect to Section 2333 of the ATA is remarkably sparse, and does not, as far as we know, address the issue.[52] What is clear, however, is that applying the ATA to COBA's conduct, which has no nexus with the United States, would necessarily involve this Court in determining whether the exercise of such congressional power would comport with the Constitution. As in *Weingarten*, this question should, in the first instance, be avoided by interpreting the breadth of the ATA so as not to reach COBA's alleged conduct.[53]

---

[52]   *Cf.* 132 Cong. Rec. S1382-88, § 2331 (1986) (finding that "it is an accepted principle of international law that a country may prosecute crimes committed outside its boundaries that are directed against its own security or the operation of its government functions ... [and] terrorist attacks on Americans abroad threaten a fundamental function of our Government: that of protecting its citizens"); H.R. Conf. Rep. No. 102-405, at 6 (1991) ("The Congress finds that the use and threatened use of weapons of mass destruction ... gravely harm the national security and foreign relations interests of the United States. . . .").

[53]   Legal scholars have noted that few cases actually address congressional power in this way since the issue can be avoided through statutory interpretation, and the doctrine of constitutional avoidance *requires* such

In the event the constitutional question cannot be avoided, however, applying the ATA to COBA's conduct would exceed congressional authority in this case because doing so would violate the reasonable expectation requirement of the Fifth Amendment's Due Process Clause and thus be fundamentally unfair.  When a domestic statute such as the ATA applies to conduct outside of the United States, the party to whom the law applies must have a reasonable and legitimate expectation that the law will be applied to it such that it would not be fundamentally unfair to do so.  This is true with respect even to a U.S. citizen's conduct abroad (as in *Weingarten*), much less a corporate defendant such as COBA, a bank incorporated in and subject to the laws of Germany.

Usually such a "reasonable expectation" can arise, as alluded to in *Weingarten*, if the conduct in question has some nexus with the United States, such that the party subject to the law could have anticipated being subject to it.[54]  *See Yousef*, 327 F.3d at 111 (explaining that for a statute to apply to a defendant's conduct abroad, ordinarily that conduct must have "a sufficient nexus [with] . . . the United States, so that such application [of U.S. law] would not be arbitrary or fundamentally unfair").[55]  The Ninth Circuit, addressing the application of U.S. law to a "stateless" ship, explained this requirement as follows:

interpretation.  *See* Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv. L. Rev. 1217, 1219 n. 12 (1992).

[54]     *See also United States v. Klimavicius-Viloria,* 144 F.3d 1249, 1257 (9th Cir. 1998), *cert. denied*, 528 U.S. 842 (1999) ("The nexus requirement serves the same purpose as the 'minimum contacts' test in personal jurisdiction. It ensures that a United States court will assert jurisdiction only over a defendant who 'should reasonably anticipate being haled into court' in this country.").

[55]     In some circumstances no nexus is required to apply a statute extraterritorially, but in general these instances have been limited to where the universality principle of international law is invoked:  "The universality principle permits a State to prosecute an offender of any nationality for an offense committed outside of that State and without contacts to that State, but only for the few, near-unique offenses uniformly recognized by the 'civilized nations' as an offense against the 'Law of Nations.'"   *Yousef*, 327 F.3d at 104.  Acts of terrorism are not one of those offenses.  *Id* at 106 (noting that "[u]nlike those offenses supporting universal jurisdiction under customary international law--that is, piracy, war crimes, and crimes against humanity--that now have fairly precise definitions and that have achieved universal condemnation, 'terrorism' is a term as loosely deployed as it is powerfully charged" and citing *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) for the proposition that

> A defendant must have a *legitimate expectation* that because he has
> subjected himself to the laws of one nation, other nations will not
> be entitled to exercise jurisdiction without *some nexus*.  Punishing
> crimes committed on a foreign flag ship is like punishing a crime
> committed on foreign soil; it is an intrusion into the sovereign
> territory of another nation.

*United States v. Caicedo*, 47 F.3d 370, 372 (9th Cir. 1995) (emphasis added).

There is no nexus here between COBA's alleged conduct and the United States.  The
account in question was in Germany.  The Orphans Project Lebanon was incorporated under the
laws of Germany and never designated a terrorist organization in the United States.  No money
allegedly flowed to or through the United States.  Whatever the intended extraterritorial reach of
the ATA may be, therefore, applying it in this case to acts of COBA would violate the reasonable
and legitimate expectations of COBA and would be fundamentally unfair and a violation of due
process.

Application of the ATA to COBA's conduct here would, furthermore, violate the fair
notice requirement of the Due Process Clause of the Fifth Amendment.  Specifically, due process
requires "that a fair warning should be given to the world in language that the common world
will understand, of what the law intends to do if a certain line is passed."  *Arthur Andersen LLP
v. United States*, 544 U.S. 696, 703 (2005) (internal quotations and citations omitted).  *See also
McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.) (Those subject to the law have a
right to a "fair warning . . . in language that the common world will understand, of what the law
intends to do if a certain line is passed. To make the warning fair, so far as possible the line
should be clear.").  This admonition is especially applicable here, since some of the provisions
that the plaintiffs rely upon for purposes of alleging primary ATA liability against COBA are

---

"while this nation unequivocally condemns all terrorist acts, that sentiment is not universal. Indeed, the nations of
the world are so divisively split on the legitimacy of such aggression as to make it impossible to pinpoint an area of
harmony or consensus.").

criminal in nature.  *See supra* Argument Section IV.  There was no notice, much less fair notice to COBA here, that its conduct would result in liability under the ATA.

International banks such as COBA operate within a vast regulatory structure that includes national banking regulations and international cooperation to root out money laundering and terrorist financing.  Those efforts have resulted in the implementation of certain well understood and utilized methods of compliance, such as reference to certain watch lists created by the U.S. Department of Treasury[56] concerning organizations that are recognized as assisting or being fronts for terrorist organizations.[57]

The Orphans Project was not and is not part of any United States terrorist watch list. Absent such an entity being designated as a terrorist organization, however, COBA would have no fair notice that it was prohibited from maintaining a banking relationship with that customer. Banks maintain millions of bank accounts for millions of customers around the world, and it is simply unrealistic—and fundamentally unfair—to hold a bank civilly responsible under the ATA for doing business with respect to a customer that neither the United States nor its home country of Germany has ever found to warrant a designation as a foreign terrorist organization or a front for such an organization.

---

[56]     The Office of Terrorism and Financial Intelligence ("TFI") within the U.S. Department of the Treasury "marshals the department's intelligence and enforcement functions with the twin aims of safeguarding the financial system against illicit use and combating rogue nations, terrorist facilitators, weapons of mass destruction (WMD) proliferators, money launderers, drug kingpins, and other national security threats."  (Nagel Decl. ¶ 8, Ex. G (U.S. Dep't of Treasury, Terrorism and Financial Intelligence website)).  Within TFI exists the Office of Foreign Assets Control (previously defined as "OFAC"), which "administers and enforces economic and trade sanctions based on US foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States.  OFAC acts under Presidential national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under US jurisdiction. Many of the sanctions are based on United Nations and other international mandates, are multilateral in scope, and involve close cooperation with allied governments."  (Nagel Decl. ¶ 10, Ex. I (U.S. Dep't of Treasury, OFAC website)).

[57]     Nagel Decl. ¶ 11, Ex. J (explaining efforts to root out terrorism financing through charities); Nagel Decl. ¶ 12, Ex. K (providing listing of designated charities and front organizations for foreign terrorist organizations); *see also* 31 C.F.R. § 594.101-94.901; Executive Order 13224.

That does not mean, of course, that COBA could freely maintain accounts in Germany in the name of designated foreign terrorist organizations—but that is not what is alleged here.  This case does not involve an alleged transgression of any relevant compliance law or regulations. Rather, in this case, plaintiffs are suggesting that despite the Orphans Project *not* being a designated foreign terrorist organization in the United States or in Germany, COBA nevertheless should have been on notice that it would be subject to liability in the United States under the ATA if it maintained an account for that customer at one of its German branch offices.  We are unaware of a single ATA case that has ever allowed the law to be stretched so far, and the ramifications of doing so would be unprecedented.

It is not U.S. law, and should not be U.S. law, that banks doing business around the world are required to police local branch customers and close their accounts, absent, at a minimum, a formal U.S. government determination that those customers are terrorist organizations.  In this respect, Chief Judge Jacobs's recent remarks reaffirming the Second Circuit's holding that the Alien Tort Statute does not apply to corporations that allegedly violated norms of international law are instructive:

> I cannot think that there is some consensus among nations that American courts and lawyers have the power to bring to court transnational corporations of other countries, to inquire into their operations in third countries, to regulate them—and to beggar them by rendering their assets into compensatory damages, punitive damages, and (American) legal fees.  Such proceedings have the natural tendency to provoke international rivalry, divisive interests, competition, and grievance—the very opposite of the universal consensus that sustains customary international law.[58]

That admonition is equally true here, where the ATA is being utilized as a tool to seek treble damages against COBA for a missile attack by Hezbollah simply because the bank maintained an

---

[58]    Denial of Rehearing in *Kiobel v. Royal Dutch Petroleum Co.*, Nos. 06-4800-cv & 06-4876-cv, 2011 U.S. App. LEXIS 2200, at *4-5 (2d Cir. Feb. 4, 2011) (Jacobs, C.J., concurring); *see also* Nagel Decl. ¶ 27, Ex. Z at 2.

account for a German entity that has never been deemed a terrorist organization or a front for such an organization.

In short, Imposing ATA liability on COBA in this case would violate the reasonable expectation and notice requirements of due process.  For these additional constitutional reasons, the Court should reject plaintiffs' construction of the statute and dismiss the Complaint in its entirety.

## CONCLUSION

Plaintiffs attempt to stretch the ATA beyond the breaking point.  They attempt to use the statute to cover an injury incurred during an act of war, not a terrorist attack.  They attempt to impose liability on COBA in the absence of any conduct by COBA fairly traceable to the alleged injury, and thus absent Article III standing.  They attempt to impose civil secondary liability on COBA where the ATA provides no such cause of action, and where plaintiffs have not pled the requisite elements of any such claim.  They attempt to impose primary liability on COBA by alleging that COBA engaged in an act of international terrorism, yet fail to allege how COBA's maintenance of a single bank account meets the statutory requirements for such an act.  And they try to extend the scope of the ATA to hold an international bank responsible for the death of Mr. Lelchook, notwithstanding that COBA's conduct has no nexus with the United States and notwithstanding that the alleged bank account in question was maintained in the name of a foreign charitable organization that is not and has never been designated by the United States or Germany as a foreign terrorist or as a front for such an organization.  Applying the ATA to COBA's conduct under these circumstances not only would violate the reasonable expectation and notice requirements of due process, but would be unworkable and unfair in practice.  For these and all the reasons set forth above, this Court should dismiss plaintiffs' Complaint in its entirety.

Dated: New York, New York
          February 16, 2011

**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, New York 10119
Telephone (212) 613-2000
Facsimile (212) 554-9661
tmyers@gibbonslaw.com
jnagel@gibbonslaw.com
psaso@gibbonslaw.com
dweinberger@gibbonslaw.com

By:   s/ Jeffrey L. Nagel
        Terry Myers
        Jeffrey L. Nagel
        Paul A. Saso
        Daniel S. Weinberger

*Attorneys for Defendant Commerzbank AG*